# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| DENNY ROSS, | )  5:04CV00849 |
| | ) |
|     Petitioner | )  JUDGE DAVID D. DOWD, JR. |
| | )  (Magistrate Judge Kenneth S. McHargh) |
|     v. | ) |
| | ) |
| JIM PETRO, | ) |
| | ) |
|     Attorney General, | ) |
|     et al, | ) |
| | ) |
|     Respondents | )  REPORT AND RECOMMENDED |
| | )  <u>DECISION OF MAGISTRATE JUDGE</u> |

McHARGH, MAG. J.

The petitioner Denny Ross ("Ross") has filed a petition for a writ of habeas corpus on double jeopardy grounds regarding his pending retrial on criminal charges of aggravated murder, rape, and other crimes,  following a mistrial in the Summit County, Ohio, Court of Common Pleas.

The undersigned Magistrate Judge submits the following Report and Recommended Decision.

<u>CONTENTS</u>

I.  State procedural background                                    1
    A.  Trial court's declaration of mistrial                     5
    B.  Post-trial evidentiary hearing                          11
        1. Parties' arguments                                12
        2. Testimonial evidence at hearing                  14
        3.  Ruling on motion to bar re-trial                19
    C.  Appeal of trial court's ruling to bar re-trial          21

II.  Petition for habeas corpus                                    23

III.  Habeas corpus review                                        25

IV.  Petitioner's representation of appellate court opinion        26

V.  Double jeopardy clause                                        28
    A.  Supreme Court caselaw on mistrial and
        double jeopardy                                     29
    B.  Cases applying Supreme Court precedent               34
    C.  Analysis of manifest necessity standard             40
    D.  Reservation of option to mistrial                   47

VI.  Unreasonable application                                     49
    A.  Timing of mistrial decision                         51
    B.  Defendant's consent                                 53
    C.  Alternatives to mistrial                            54
    D.  Analysis of unreasonable application                58

VII.  Due process violation                                       65

VIII.  Unreasonable determination of the facts                    67

IX.  Motion to perfect the verdicts                               69

X.  Summary                                                       73

Denny Ross (Ross) has filed a petition for a writ of habeas corpus regarding his pending retrial on charges of aggravated murder, tampering with evidence, and gross abuse of a corpse, following a mistrial in the Summit County (Ohio) Court of Common Pleas. The petition is based on the Fifth Amendment constitutional protection against double jeopardy.  (Doc. 1, at ¶¶ 2-3; doc. 57, at ¶¶ 2-3.)  See generally Arizona v. Washington, 434 U.S. 497, 503 (1978); Harpster v. Ohio, 128 F.3d 322, 327 (6th Cir. 1997), cert. denied, 522 U.S. 1112 (1998).  The double jeopardy claim arises from the trial court's allegedly improper declaration of a mistrial, over the objection of the defendant, in a situation where the petitioner claims that the jury had already rendered unanimous "not guilty" verdicts on the charges of aggravated murder, murder, and rape.   (Doc. 1, at ¶¶ 6, 42, 58; doc. 7, Petitioner's exhibit (hereinafter,"PX") G.)


I.  STATE PROCEDURAL BACKGROUND

Ross was arrested on May 27, 1999, in connection with the murder of Hannah Hill.  (Doc. 7, PX I2, Summit County docket; doc. 35, Respondent's exhibit (hereinafter,"RX") 1, docket.)  On June 10, Ross was indicted on charges of aggravated murder, rape, kidnapping, tampering with evidence, and abuse of a corpse.  (Doc. 35, RX 3, indictment.  See also RX 51, supplemental indictment of Dec. 20, 1999.)  Ross was arraigned on June 11, 1999.  (Doc. 35, RX 14.)  The jury trial

1

commenced on September 28, 2000, in the Summit County Court of Common Pleas, Judge Jane Bond ("Judge Bond") presiding.

On Oct. 19, 2000, the court ordered that all jurors were to be identified solely by assigned number, because of the extraordinary level of pretrial publicity and concerns for the privacy of the jurors.  (Doc. 35, RX 158.)  That day, the Akron Beacon Journal had requested the production of the jury questionnaires, along with the names and addresses of the jurors.  See State ex rel. Beacon Journal Pub. Co. v. Bond, 98 Ohio St.3d 146, 147, 781 N.E.2d 180, 184 (2002).

At the close of the prosecution's case, the court granted a Rule 29(A) motion for acquittal on the charge of kidnapping.  (Doc. 35, RX 168, journal entry.)

During the prosecution's rebuttal in closing argument, the defendant objected to several purported misstatements of evidentiary facts.  See, e.g., doc. 35, RX 291, trial transcript (hereinafter, "Tr."), at 1172, 1175, 1248-1252.  The court overruled these objections, and the defendant moved for a mistrial with prejudice on the basis of the prosecution's allegedly improper closing rebuttal.  (Doc. 35, RX 169 and 167; RX 292, Tr., at 1267.)

The case went to the jury on Oct. 27, 2000.  On Saturday, October 28, while the jury was deliberating, the trial judge received a note from the foreperson which raised an issue of juror misconduct.  The trial judge offered the parties the opportunity to voir dire the foreperson or the suspect juror, which they declined.  The judge then asked the parties whether they would consent to the discharge of the jury.

2

The state consented, but Ross did not.  (Doc. 35, RX 168, journal entry.)  The court

declared a mistrial.  (Doc. 35, RX 292, Tr., at 1276-1277.)  On Nov. 2, 2000, the judge

set a new trial date, and journalized the declaration of the mistrial.  (Doc. 35, RX 171;

State v. Ross, No. 20980, 2002 WL 31890088, at *2 (Ohio Ct. App. Dec. 31, 2002).)

The events surrounding the mistrial will be discussed in more detail in the following

section.

　　　After the trial court's declaration of a mistrial, Ross filed several motions on

Nov. 9, 2000.  Ross filed a motion for a judgment of acquittal, pursuant to Ohio R.

Crim. P. 29(C), on the counts of aggravated murder, murder, rape, tampering with

evidence, and abuse of a corpse.  (Doc. 35, RX 176.)  Ross also filed a motion to perfect

the verdicts, based on the completed jury forms which apparently indicated the jury

had reached "not guilty" verdicts on the charges of aggravated murder, murder, and

rape.  (Doc. 35, RX 177; doc. 7, PX G.)  In addition, Ross filed a motion to bar retrial

on the grounds of double jeopardy.  (Doc. 35, RX 174.)

　　　Finally, Ross filed a motion to disqualify the trial judge (Judge Bond), on the

grounds that she had "exhibited bias toward Ross and is likely to be a witness in the

proceedings in this case."  (Doc. 35, RX 178, at 3.)  On Jan. 17, 2001, the Ohio

Supreme Court granted the motion to disqualify on the basis that "there appears to

be a significant likelihood that Judge Bond will be called to testify in subsequent

proceedings about her actions in this case after she learned of possible juror

misconduct."  (Doc. 35, RX 189; In re Disqualification of Bond, 94 Ohio St.3d 1221,

3

763 N.E.2d 593 (2001) (Moyer, C.J.))  The case was transferred to Judge Joseph Cirigliano, Visiting Judge Sitting on Assignment.

An evidentiary hearing on the post-trial motions was held before Judge Cirigliano on May 22, 2001.  Based on the evidence presented, the judge found that there had been no manifest necessity for a mistrial, that the first trial judge had abused her discretion by declaring a mistrial, and held that a retrial of Ross was barred by his constitutional protection against double jeopardy.  The court declined to rule on the other pending motions at that point.   (Doc. 35, RX 229, order of Feb. 15, 2002; doc. 7, PX A.)

The state appealed on two grounds, including that:  "The second trial court's dismissal on double jeopardy grounds is a nullity because the first trial court acted within [its] discretion by declaring a mistrial sua sponte."  (Doc. 35, RX 300, at 14.) The court of appeals agreed with this assignment of error, and reversed:  "The visiting judge, based on an incorrect legal standard, erred in finding that there was no manifest necessity for a mistrial."  The case was remanded for retrial.  (Doc. 35, RX 312, at ¶ 52; Ross, 2002 WL 31890088, at *10.)   Ross appealed to the Ohio Supreme Court, which declined to hear his appeal on May 7, 2003.  (Doc. 35, RX 315; State v. Ross, 98 Ohio St.3d 1567, 787 N.E.2d 1231 (2003).)

On Sept. 10, 2003, the trial court denied the motion to perfect the verdicts, on the basis that the jury had been discharged prior to the verdicts being given to the

4

court.  The court also denied the Rule 29 motion for acquittal.  The court set a trial

date of Nov. 17, 2003.[1]  (Doc. 35, RX 251.)

On reconsideration of the Rule 29 motion, however, the court acquitted Ross

on the charge of rape on Dec. 22, 2003, although denying acquittal on the other

charges.  (Doc. 35, RX 273.)  The state has appealed that ruling, but that (second)

appeal is not the subject of this habeas petition.  See Doc. 35, RX 276, 278; State v.

Ross, No. 21906 (Ohio Ct. App. filed Jan. 20, 2004).

### A.  Trial Court's Declaration of Mistrial

On Saturday, October 28, 2000, during jury deliberations, the trial judge

received a note from the foreperson which raised an issue of juror misconduct.  The

note read as follows:

> There is a concern about a Juror.  I was approached by a spokesperson
> for 4 other Jurors.  From comments made by this Juror these 4 Jurors
> feel that he is agreeing with the group to expidite (*sic*) this process.  I
> was told by  these Jurors that they (*sic*) following comments were made
>
> 1.)  We need to get this done today.
>
> 2.)  Why are we even discussing this.
>
> He has stated all along that he believes one thing but has all to (*sic*)
> quickly changed his vote to go along with the group.  This morning this
> Juror stated to me that we need to finish this today as he will be leaving
> after today because he has a problem at home but he did not want to put
> us in that position.

---

1The trial date was later continued.  (Doc. 35, RX 258.)

> To another Juror he made the comment that he knows that Brad O'Born was innocent because he passed a polygraph test so Denny Ross had to be guilty.
>
> I have been asked if this Juror can be released so that he may tend to his affairs at home, and we can have an impartial and fair jury.
>
> Juror #4

 (Doc. 35, RX 168; RX 292, Tr., at 1264-1265.)  The court notified counsel and gave

them an opportunity to consult before proceeding on the record at 3:40 p.m.

The court asked counsel whether they would "consent to the discharge of the

jury without prejudice to the further prosecution of the case," pursuant to Ohio Rev.

Code § 2945.36(D).  (RX 292, Tr., at 1266.)  The prosecution consented, referring to

the defendant's right to a fair trial.  Id.  The defense renewed their motion for a

mistrial with prejudice, based on the improper closing, but the court deferred ruling

on that motion until the prosecution had "a full or fair opportunity to respond."  Id. at

1267.

The defense then made several requests:

> MR. PANCER [defense counsel]:  The second request is that the jury be instructed to continue to deliberate, a verdict be rendered with the defense option of a mistrial if the decision were to be unfavorable.  The theory for that request is that the extra judicial evidence that exists in the jury room is not evidence that is favorable to the defense and hence we believe a verdict of not guilty would not be tainted as a — as any other verdict would be, Your Honor.  That is our next request.
>
> THE COURT:  All right, sir.  The motion is denied.  I think that's fundamentally unfair to the State.
>
> MR. PANCER:  Our next request is a mistrial with prejudice.

6

THE COURT:  And the basis for that?

MR. PANCER:  The basis for that is the motions that we have previously filed in this case, the motion we have filed with this Court and all the grounds that might have given rise to a mistrial motion, Your Honor, including the question — including the information contained in the taped statement of Denny Ross.

THE COURT:  And so you're essentially renewing your previous motions for this Court?

MR. PANCER:  Yes, in the context of this hearing.

THE COURT:  All right, sir.  Motion is overruled.

MR. PANCER:  Okay.  I talked to Mr. Ross.  He does not wish to have a mistrial in this case.  I've told him the different sections of the code that allow it in terms of the one under his consent.  He does not want it to be on that particular ground, Your Honor.

(RX 292, Tr., at 1268-1270.)

The court established that Ross had discussed the matter with his counsel,

and informed Ross that the law provides that he is able to consent to a mistrial based

on what the court characterized as "the misconduct and corruption of at least one of

the jurors in this trial."  Id. at 1270.  Ross indicated that he did not want a mistrial.

The court continued:

THE COURT:   . . . my concern based on this is that this evidence and these statements that have  come from this jury are extremely damaging to the prospect that you could receive a fair trial, sir.
   What this note is saying, Mr. Ross, is that at least one juror believes you're guilty based upon no evidence that was presented during this trial.  Do you understand that?

THE DEFENDANT:  I understand, Your Honor.

7

> THE COURT:  And that he's made these representations to other jurors
> in that jury room and that he is refusing in good faith to negotiate with
> other jurors; that he is refusing in good faith to continue deliberations
> fully and fairly; that he is indicating he would leave at the end of today
> and that they must conclude this case today.  This is a refusal to fulfill
> the obligation of a juror.
>
>    Court also is concerned that his representations regarding evidence
> that he apparently believes based on this, evidence that was not
> presented during trial.

(RX 292, Tr., at 1270-1271.)  The court noted that during jury instructions the jurors

were advised of their obligation to render a fair and impartial decision, and to advise

the court if there were any reasons that they could not do so.  Id. at 1271-1272.  The

proceeding continued:

> THE COURT:  . . . Court further finds that as a result of his
> representations to other jurors that he has impeded full and fair
> deliberation of the evidence in this case and that this Court is
> absolutely convinced that there's no way what the bell has struck I can
> unring.
>
>    And his representations to other jurors regarding the guilt of Mr. Ross
> based upon this purported polygraph test I don't believe could be
> purged.  And I don't believe seating an alternate at this point  in time
> could undo the damage that's been done to the deliberations in this
> case.
>
>    And, no, Mr. Ross, none of us wants a mistrial.
>
>    Based upon the communication from the juror, I have offered to both
> the prosecution and the defense the opportunity to voir dire either
> Juror No. 4 or to identify and voir dire the juror who purportedly has
> made these statements.  Do you wish that opportunity on behalf of the
> prosecution?
>
> MR. GREVEN:  No, Your Honor.  We are not in favor of voir dire during
> deliberations.
>
> THE COURT:  On behalf of the defense?
>
> MR. PANCER:  We have the same position.

THE COURT:  So you are not requesting that the Court voir dire any of the jurors regarding their potential for service in this case?

MR. PANCER:  Not at this time.

THE COURT:  This is the time, sir.  There is no other.

MR. PANCER:  No, no.  We're not asking the Court to voir dire the jury.

THE COURT:  All right.
   All right.  Court, based upon its stated conclusions and based upon the face of the communication given by Juror No. 4, and since neither party wishes additional inquiry to be made by the Court in regard to a voir dire of any of the potential jurors, Court finds that the jury is unable to fulfill the obligations required by law, to fully and fairly consider the evidence and render a verdict based upon the evidence and the law in this case.

(RX 292, Tr., at 1272-1274.)  The court found that there had been no misconduct by counsel from either side in regard to this matter.  The court found that "there has been no evidence of any misconduct or jury tampering outside the province of the 12 jurors themselves," and asked if anyone had any information to the contrary.  Id. at 1274-1275.  At this point, the defense interjected:

MR. CHESNOFF:  Your Honor, excuse me.  We're not foreclosed from exploring this?  I mean, I know you said we don't have any information now, but that is not in any way —

THE COURT:  Do you want to voir dire the jury, sir?

MR. CHESNOFF:  Not during their deliberations I do not.  I think that would have a prejudicial impact on the deliberations.

THE COURT:  I will permit inquiry of the jury after a decision has been made by the Court if the jury is discharged.  Certainly that will be done.

9

However, I want to make the record clear that I am giving the prosecution and the defense an opportunity to have this Court and to have them voir dire any individual jurors during deliberations in response to this.

MR. CHESNOFF:  Thank you, Your Honor.  We appreciate that.  We understand the distinction.

THE COURT:  And you decline that?

MR. CHESNOFF:  Yes.

THE COURT:  And the prosecution has declined that?

MR. GREVEN:  Yes.

(RX 292, Tr., at 1275-1276.)  The court again inquired as to whether anyone had any

further information regarding jury tampering, and noted that the court had no

factual basis for believing that a polygraph of O'Born had been conducted.  The court

continued:

THE COURT:  . . . All right.  No one having come forth, the Court has — based upon the representations made, the Court finds pursuant to Ohio Revised Code 2945.36 that there is corruption of a juror pursuant to subsection A.  Court finds that this jury cannot render a fair and impartial verdict in accordance with the law.  The Court therefore discharges the jury without prejudice to the prosecution.  A mistrial is declared.
   Court will summons this panel and they will be discharged from further attendance.
   I will hear further in regard to this matter on Monday morning at 9:00, require the attendance of all at that time.
   I will further allow inquiry to be made of this jury once they have been discharged.  That will not be record inquiry, however.

MR. PANCER:  It will be here today, Your Honor?

THE COURT:  Yes, sir. It will be here today.

10

MR. PANCER:  We can visit with them?

THE COURT:   Yes, sir.

MR. CHESNOFF:  May we have one moment, Your Honor?

MR. GREVEN:  Your Honor, I just have a question as to whether the
Court will be conducting this inquiry or if this is just going to be — I
kind of get the impression from the last thing the Court said it's going
to be a free-for-all, if we catch them in the hall kind of thing.
   Will the Court be doing this?  Would the Court like us to do it?  How
would you like to proceed?

THE COURT:  I will discuss that with you in chambers before they are
discharged.

MR. GREVEN:  All right.

MR. CHESNOFF: Thank you.

(RX 292, Tr., at 1276-1278.)  There followed a brief discussion regarding the filing of

the earlier motion, and the court was adjourned at 4:00 p.m.  Id. at 1279.  The events

that followed the adjournment were not on the trial record, but are relevant to this

court's consideration of the mistrial.

<u>B.  Post-Trial Evidentiary Hearing</u>

On May 22, 2001, Judge Cirigliano held an evidentiary hearing on the post-

trial motions.  (Doc. 35, RX 293 and 294, Hearing Transcript (hereinafter, "H.Tr.").)

Testimony was taken from Melissa Gribek ("Gribek"), a trial juror; Thomas L. Orwig,

Jr. ("Orwig"), the jury foreman; Judge Jane Bond; Jill Coleman ("Coleman"), Judge

Bond's bailiff; and David Chesnoff ("Chesnoff"), defense counsel.  In addition, counsel

proffered the testimony of defense counsel David Nickerson ("Nickerson") and

Michael Pancer ("Pancer").  (RX 294, at 183-186.)

### 1.  Parties' arguments

Counsel for Ross argued that <u>Arizona v. Washington</u>, 434 U.S. 497 (1978),

held that a mistrial declared over the objection of the defendant bars a retrial, unless

there was a "manifest necessity" supporting a mistrial.  Further, Ross argued that

the prosecution had a heavy burden to justify the trial judge's action, and that the

court must examine with "a high degree of scrutiny" the judge's decision to declare a

mistrial.  (RX 293, H.Tr., at 7.)  He further asserted that the Supreme Court, in <u>Jorn</u>

<u>v. Dalitz</u>[2], mandated that "a defendant has a constitutional right to go to the first

jury to end the dispute with an acquittal."  <u>Id.</u> at 8-9.

Counsel for Ross said that they consulted with other counsel after the jury

note came in, and they all believed that they had won the case before the jury.  <u>Id.</u> at

9.  Based on what they believed was the weakness of the prosecution's evidence, they

had made a tactical decision to close, without putting on any defense evidence, after

the close of the prosecution's case.  <u>Id.</u> at 10.

After consultation, counsel for Ross decided not to voir dire the jury during

deliberations because they "were concerned that it would prejudice the jury, and

---

2Presumably, counsel intended to refer to <u>United States v. Jorn</u>, 400 U.S. 470
(1971) and <u>United States v. Dinitz</u>, 424 U.S. 600 (1976).  The court is unable to locate
a Supreme Court case entitled <u>Jorn v. Dalitz</u>.

since the polygraph evidence that was the subject of the note only could potentially prejudice [Ross]," they believed the decision as to whether to accept a mistrial was their choice. <u>Id.</u> at 11. Ross asserted that the prosecution conceded that there was no prejudice to the state by way of the juror's note. <u>Id.</u>

Ross argued that several alternatives to mistrial were available to the trial judge: The law in Ohio permits partial verdicts; the juror could be replaced with an alternate; the jury could have deliberated with eleven members, rather than twelve. In addition, Ross contended that Supreme Court precedent places an obligation on the judge to voir dire the jury in such a case. <u>Id.</u> at 11-12.

Ross pointed out that after the trial judge orally declared a mistrial, the judge learned that verdicts had been reached on several counts. Ross contended: "At that moment in time manifest necessity no longer existed." <u>Id.</u> at 22.

Counsel for the state responded that, although neither side wanted to voir dire the jury, both sides wanted a mistrial. The state contended that a mistrial was appropriate because "all the evidence indicated that there was an unfair trial, that there was a juror that was poisoning and contaminating the minds of other jurors with evidence that was not properly admitted." <u>Id.</u> at 33. The state also argued that there was no defense objection to the mistrial, nor to the discharge of the jury, on the record. <u>Id.</u> at 34-35.

The state contended that "double jeopardy did not attach in this case." Although the state did not argue in terms of "manifest necessity," their summary

13

argument stated: "The facts that [Judge Bond] saw at that time with the assistance and advice from the parties indicated that a mistrial and the discharge of the jury was the only reasonable alternative." <u>Id.</u> at 40. The state conceded that there may have been "more than one reasonable solution," but "[t]he fact she chose this one doesn't make her decision subject to attack by the defense at this late date." <u>Id.</u>

Ross responded that the defense did not want a mistrial, but made it clear to the judge that they wanted the deliberations to continue. <u>Id.</u> at 41. They argued that <u>Corey v. District Ct. of Vermont</u>, 917 F.2d 88 (2d Cir. 1990), is "a classic rendition of when manifest necessity does not exist for a mistrial on facts consistent with the facts of this case." <u>Id.</u> at 42.

2.  Testimonial evidence at hearing

Juror Gribek testified that the three contested verdict forms were signed on Saturday, Oct. 28, 2000, prior to the jury's lunch break. (Doc. 35, RX 293, H.Tr., at 57.) Juror Orwig, the foreman, also testified that the verdict forms were signed on Saturday morning, prior to the lunch break. <u>Id.</u> at 72. Orwig composed the note to the judge after the verdict forms were signed, and he testified that the events that led him to write the note occurred after the verdict forms were signed. <u>Id.</u> at 72, 74.

Judge Bond testified that she received the note from the jury after the lunch break, sometime in mid-afternoon. (RX 294, H.Tr., at 88, 115.) Judge Bond characterized the note as "extremely" prejudicial to Ross, because one juror was "expressing an opinion on the guilt of the defendant" based on the purported

14

polygraph information.  Id. at 89.  As a result of receiving the note, counsel were called into the judge's chambers.  Id. at 89-90.  In chambers, a number of alternatives were discussed, but the final result of the discussion was that the judge decided to declare a mistrial.  Id. at 90.  Among the alternatives discussed were: seating an alternate juror; voir dire of the jury; allowing the jury to finish deliberating; and declaring a mistrial.  Id. at 90-91.

The trial judge conceded in her testimony that she had offered Ross a mistrial, which he refused, at several other points during the trial process.  At one point, during voir dire, the parties learned that some of the potential jurors had been tainted by a broadcast that they saw in the jury room.  The judge offered Ross the chance to re-impanel and start the voir dire selection process anew.  Later, the defense objected to certain evidence because they had not had the opportunity to test it.  The judge offered Ross the opportunity to start the trial over, and test the evidence, and he rejected that.  Id. at 99-101.

With regard to the juror's note, after a period of time, the parties returned to the courtroom, on the record.  Id. at 90.  The proceedings on the record have been summarized above. Judge Bond testified that, when she declared the mistrial, the jury was not in the courtroom, but in the jury room.  Id. at 103.  After the judge declared the mistrial, she went back to her chambers, and then walked into the jury room.  Id. at 102-103.

15

The amount of time that the judge remained in her chambers before going to the jury room is in dispute.  Judge Bond testified:

Q.  You went back to the jury room; is that correct?

A.  First I went back to my chambers and then after a period of time I walked back into the jury room.

Q.  You went back to your chambers and picked up the juror information release forms; is that correct?

A.  I waited for what I thought was going to happen next.  When it didn't happen, I picked up the release forms and went out and stood in the entry door to the courtroom and everybody was there and so I walked back to the jury room.

(RX 294, H.Tr., at 103-104.)  Defense counsel Chesnoff testified that Judge Bond remained in her chambers for thirty seconds before she left her chambers and went directly to the jury room.  Id. at 175.  The proffered testimony of defense counsel Nickerson would also be that the judge remained in her chambers for "no more than 30 seconds," id. at 184, and defense counsel Pancer would also have testified that she remained in chambers for "no more than a minute, I think about half a minute," id. at 185.

Gribek and Orwig testified that Judge Bond then came into the jury room alone, without a court reporter or counsel for either side.  (RX 293, at 58, 74; see also RX 294, at 104.)  At that point, she informed the jury of her decision to declare a mistrial.  Id. at 58, 74-75; see also RX 294, at 104.  Gribek testified that there was "a lot of emotion" in the jury room, and  "there were generally comments from everyone

16

in the room not understanding why she was doing this." Id. at 58-60.  Judge Bond testified that some of the jurors were "extremely upset." (RX 294, at 104.)

Gribek and Orwig testified that Judge Bond advised the jurors that if any one of them wanted to speak with her individually, she would accommodate that.  (RX 293, at 61, 75.)  Gribek and Orwig were among the five jurors who spoke with the judge in her chambers.  Id. at 62, 75.  Within a few minutes of the judge leaving the jury room, the five jurors were escorted to the judge's conference room.  Id. at 63.

Gribek was the second juror brought into the judge's chambers, individually, to speak with her.  Id. at 63.  Gribek informed the judge that verdicts had been reached on several counts, and the forms had been signed.  Id. at 64; see also RX 294, at 106.  Orwig was aware that Gribek had told Judge Bond that there were signed verdicts.  Id. at 76.  The judge did not inquire as to whether the verdicts had been reached before the issues in the juror's note arose.  (RX 294, at 115-116.)  Her bailiff was instructed to return to the jury room to collect the verdict forms.  Id. at 166-167.

Gribek expressed some concern to Judge Bond about what would happen to Ross now, and the judge told her that there was certain evidence that wasn't introduced during the trial, and so there would be another trial.  (RX 293, at 65.)

After Gribek spoke with the judge and notified her of the verdicts, the five jurors were still together in the judge's chambers area, and the remaining seven jurors were waiting in the jury room.  Id. at 66-67.  The jurors had made a decision to wait for each other, to leave together.  Id. at 68.  Orwig also stated that all twelve

17

jurors were still together in the courthouse after the judge was informed that there were signed verdicts. Id. at 76. See also RX 294, at 167 (bailiff testimony).

Gribek testified that the jury was never assembled in open court to be excused or discharged. Id. at 64. Orwig also testified that the entire jury was never placed in the jury box or the courtroom, and that the judge never made an announcement of the mistrial in front of the parties in the courtroom with the jury present. Id. at 75. See also RX 293, at 15-16. Orwig testified that the judge did not provide him with an opportunity to make a record that the jury had signed verdicts. Id. at 76.

After the trial judge spoke with the five jurors, she then spoke with a newspaper reporter in her chambers. (RX 294, at 118, 186.) Counsel tried to speak with the judge after the jurors left her chambers, but was advised to wait until she had finished speaking with the reporter. While the judge was speaking with the newspaper reporter, the jurors were being taken out of the courthouse and released. Id. at 135, 186.

Judge Bond testified about the issue of notification to counsel:

Q. Had you told us about the verdicts, that is the defense, we probably would have asked you to record those verdicts; is that correct?

A. I don't know what you would have asked me.

Q. As you sit here today, had you told us after you talked to the juror and were told there were verdicts of not guilty rendered, you don't believe that we would have asked you to record those verdicts?

A. Counsel came in and I gave him the verdicts. He didn't ask me to record anything.

18

Q.  Well, let's talk about that.  If you have told us at the time when all the jurors were there, don't you believe we would have asked you to record the verdicts.

A.  I'm sure you would have.

Q.  And had we asked you to record the verdicts and all the jurors had been there then we would have had a discussion on the record with the jurors there about exactly what happened; is that correct?

A.  I doubt it.

Q.  You would not have conducted such a hearing?

A.  The trial was over.  We were finished.

(RX 294, H.Tr., at 116-117.)  Judge Bond testified that, after she learned that there were "not guilty" verdicts, she could not have taken the verdicts in open court because the jury had been discharged and the case was adjourned.  Even if she had reassembled the jury, she could not have accepted the verdicts because they were tainted.  Id. at 108.  Judge Bond testified that the juror in question would have had to have disregarded her instructions concerning outside information to learn about the polygraph.  Id. at 109.  In addition, the note also indicated that the juror was refusing to deliberate in good faith.  Id. at 110.

### 3.  Ruling on motion to bar re-trial

Following the evidentiary hearing, the Summit County Court of Common Pleas (Cirigliano, J.) granted the motion to bar retrial on double jeopardy grounds. (Doc. 35, RX 229, order of Feb. 15, 2002; doc. 7, PX A.)

19

The court recognized that when a mistrial has been declared without the defendant's consent, double jeopardy bars re-trial if there was no manifest necessity for ordering a mistrial, or the ends of public justice would otherwise be defeated.  Id. at 11.  The court noted that the burden is on the prosecution to establish that manifest necessity existed.  Id. at 12 (citing Washington, 434 U.S. at 505; Glover v. Macknin, 950 F.2d 1236, 1242 (6th Cir. 1991)).  The court asserted that any doubt must be resolved in favor of the defendant.  Id. (citing Downum v. United States, 372 U.S. 734 (1963)).  The court set forth various legal factors which must be considered in deciding whether to grant a mistrial.  Id. at 11-14.

The court ruled:

In the present case there existed no manifest necessity for declaring a mistrial.  Reasonable alternatives to a mistrial existed and the public interest in fair trials designed to end in just judgments was not met by the trial court's declaration of a mistrial.  The trial court abused its discretion in declaring a mistrial because it failed to investigate the information set forth in the jury note, it failed to explore alternatives to declaring a mistrial, it failed to take into consideration the verdicts that had been reached by the jury, it failed to ascertain whether any prejudice existed as a result of the information related in the foreperson's note, it failed to attempt to cure any taint which may have existed, it acted precipitately in the declaration of a mistrial, and it failed to duly consider the defendant's right to have his trial completed by a particular tribunal, especially in light of the fact that this is a capital case.

Id. at 15-16.  Thus, the motion to bar a re-trial on double jeopardy grounds was granted.  Id. at 16.

### C.  Appeal of Trial Court's Ruling to Bar Re-Trial

The state appealed the court's ruling, setting forth two assignments of error. The first assignment of error was:  "The second trial court's dismissal on double jeopardy grounds is a nullity because the second trial court acted without jurisdiction and in violation of the Ohio Constitution when it reviewed and reversed the discretionary decision of the first trial court."  (Doc. 35, RX 300, at 8.)  The court of appeals rejected the argument that the trial court did not have jurisdiction to rule on the motion.  The court recognized that "[t]he issue of double jeopardy following a trial court's sua sponte declaration of a mistrial is routinely raised through a motion to bar retrial."  (Doc. 35, RX 312, at ¶ 16; State v. Ross, No. 20980, 2002 WL 31890088, at *3 (Ohio Ct. App. Dec. 31, 2002).)

The second assignment of error was dispositive:  "The second trial court's dismissal on double jeopardy grounds is a nullity because the first trial court acted within [its] discretion by declaring a mistrial sua sponte."  (Doc. 35, RX 300, at 14.) The state's memorandum in support was based primarily on this proposition.  See generally RX 300 (appellant's brief).  The state only briefly asserted that "there was a high degree of necessity for declaring a mistrial," basing this argument on the theory that "Ohio law limits the ability of courts to investigate juror misconduct during deliberations."  Id. at 18-19.

In addressing the second assignment of error, the court of appeals stated:

> This Court has found no authority for reviewing the propriety of a mistrial decision based on an evidentiary hearing held nearly seven months after the decision was made. On the contrary, the mistrial decision should be evaluated on the record that was prepared at that time. Consequently, this Court confines its review to the record of October 28, 2000.

(RX 312, at ¶ 20; <u>Ross</u>, 2002 WL 31890088, at *3 (internal citations omitted).)

Next, the court looked to the standard of review, and concluded that the finding that there was no manifest necessity for a mistrial was a legal conclusion to be reviewed de novo. <u>Id.</u> at ¶ 27. The court of appeals concluded that the lower court "committed reversible error in finding that there was no manifest necessity for a mistrial." <u>Id.</u>

The appellate court reasoned that the lower court "improperly equated 'manifest necessity' with absolute necessity." <u>Id.</u> at ¶ 28. The court stated that the U.S. Supreme Court, in both <u>Arizona v. Washington</u> and <u>United States v. Jorn</u>, "made it clear that a trial court abuses its discretion by declaring a mistrial without considering *any* alternatives; it did not hold that the trial court must rule out all possible alternatives before declaring a mistrial." <u>Id.</u> The court found that the record of the case "demonstrate[d] that the trial judge allowed the parties to state their positions, considered their competing interests, and made a thorough inquiry into reasonable alternatives prior to declaring a mistrial in this case." <u>Id.</u> at ¶ 29.

The court did not directly address the prosecution's burden in pursuing a second prosecution, but stated:

22

> Ross and the visiting judge repeatedly emphasized the fact that the
> prosecution did not argue that the State's interests were at stake but
> spoke only of the potential prejudice to Ross, suggesting that such a
> failure somehow waived the State's interest or removed it from the
> mistrial balancing test.

Id. at ¶ 35.

The court of appeals reversed:  "The visiting judge, based on an incorrect legal standard, erred in finding that there was no manifest necessity for a mistrial."  The case was remanded for retrial.  (Doc. 35, RX 312, at ¶ 52; Ross, 2002 WL 31890088, at *10.)


## II.  PETITION FOR WRIT OF HABEAS CORPUS

Ross filed a petition for a writ of habeas corpus on May 6, 2004.  The petition alleges that Ross is a person subject to unlawful future custody pursuant to this judgment of the Ohio Court of Appeals, and that the court's decision violates the Constitutional protection against double jeopardy. (Doc. 1, at 4.)  Ross requested that this district court stay the pending criminal proceedings against him in state court. Id. at 1.

Ross argues that the state appellate court acted contrary to clearly established federal law by holding that he could be prosecuted a second time following an acquittal.  Id. at 38-39.  He also claims that the state appellate court acted in violation of the Due Process Clause by its "unfair and arbitrary judicial action," that is, by rendering an arbitrary decision.  Id. at 39-42 (citing Rogers v. Tennessee, 532

23

U.S. 451 (2001)).  Further, he alleges that the appellate court acted contrary to clearly established federal law by holding that he did not have a constitutional right to a pretrial evidentiary hearing in support of his double jeopardy claim.  Id. at 42-45.

Ross also claims that the state appellate court acted contrary to clearly established federal law by "absolving the trial judge of her duty to exercise sound discretion by declaring a mistrial."  Id. at 45-53.  It is also argued that the state court "acted contrary to clearly established federal law in holding that the trial court could force Petitioner to choose between his double jeopardy rights and his impartial jury rights," where there was no "cognizable hardship" on the prosecution.  Id. at 53-57.  In addition, Ross accuses that the state court of appeals of "holding that a trial judge may order a mistrial over the objection of a defendant for the sole purpose of preventing an acquittal."  Id. at 57-59.

Finally, the petition asserts that the state appellate court's application of federal law was "objectively unreasonable."  Id. at 60-61.  Ross also argues that the court's conclusion that the (first) trial judge sufficiently considered his double jeopardy interests before declaring a mistrial was "an unreasonable determination of the facts in light of the evidence presented at the state court [evidentiary] proceeding."  Id. at 61-64 (citing Wiggins v. Smith, 539 U.S. 510 (2003)).

Ross was granted leave to amend his petition[3] to add an additional ground (doc. 43), that his double jeopardy rights will be violated because the state refuses to acknowledge that he has been lawfully acquitted.  (Doc. 32, at 2.)  This claim is based on the trial court's denial of his motion to perfect the verdict.  Id. at 4.

### III.  HABEAS CORPUS REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, which provides the standard of review that federal courts must apply when considering applications for a writ of habeas corpus.  Under the AEDPA, federal courts have limited power to issue a writ of habeas corpus with respect to any claim which was adjudicated on the merits by a state court.  The Supreme Court, in Williams v. Taylor, provided the following guidance:

> Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied -- the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing

---

3The amended petition (doc. 57) is identical to the original, with the exception of the added claim, which is appended at pp. 62-68.  Compare doc. 1, ¶¶ 1-174, with doc. 57, ¶¶ 1-174.

legal principle from this Court's decisions but unreasonably applies
that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2002).  See also Lorraine v. Coyle, 291 F.3d

416, 421-422 (6th Cir. 2002), cert. denied, 538 U.S. 947 (2003).

A state court decision is "contrary to" clearly established Supreme Court

precedent "if the state court applies a rule that contradicts the governing law set

forth in [Supreme Court] cases."  Williams, 529 U.S. at 405.  See also Price v.

Vincent, 538 U.S. 634, 640 (2003).

A state court decision is not unreasonable simply because the federal court

considers the state decision to be erroneous or incorrect.  Rather, the federal court

must determine that the state court decision is an objectively unreasonable

application of federal law.  Williams, 529 U.S. at 410-12; Lorraine, 291 F.3d at 422.


IV.  PETITIONER'S REPRESENTATION OF APPELLATE COURT OPINION

Several claims in the petition misrepresent the holding of the state court of

appeals.  For example, Ross contends that the state court held "he could be

prosecuted a second time following an acquittal."  (Doc. 1, at 38.)  Such a ruling would

arguably present a clear constitutional violation, had the appellate court so held.

However, the state as appellant did not present this issue to the court of appeals for a

determination, and a plain reading of the court's opinion does not reveal that the

court stated in any manner that Ross "could be prosecuted a second time following an

acquittal." <u>See generally</u> Doc. 35, RX 312; <u>Ross</u>, 2002 WL 31890088.  Ross provides no citation to the opinion supporting his assertion.  <u>See</u> doc. 1, at 38, ¶ 103.

Ross also claims that the state court of appeals held that "he did not have a constitutional right to a pretrial evidentiary hearing in support of his double jeopardy claim."  He argues that the court ruled that the evidentiary hearing was "unlawful."  <u>See</u> doc. 1, at 43, ¶ 119.  Reference to the appellate court's opinion reveals the following:  "This Court has found no authority for reviewing the propriety of a mistrial decision based on an evidentiary hearing held nearly seven months after the decision was made.  On the contrary, the mistrial decision should be evaluated on the record that was prepared at that time."  Doc. 35, RX 312, at 8; <u>Ross</u>, 2002 WL 31890088, at *3.  Thus, the court limited the permissible scope of the hearing, rather than holding that defendant was not entitled to a hearing.

Ross accuses the state court of "holding that a trial judge may order a mistrial over the objection of a defendant for the sole purpose of preventing an acquittal." (Doc. 1, at 57.)  Needless to say, the state did not present this issue to the court of appeals for determination.  The position of the appellate court was that the purported verdicts were not to be considered, as "information that was discovered after the mistrial was declared."  Doc. 35, RX 312, at 16; <u>Ross</u>, 2002 WL 31890088, at *7 n.3. The court emphasized that "it confine[d] its review to the record prepared at the time the decision was made."  <u>Id.</u>  The court certainly did not hold that "a trial judge may

order a mistrial over the objection of a defendant for the sole purpose of preventing an acquittal."

The petition for a writ of habeas corpus will not be granted on any of the aforementioned grounds.  However, the court finds that the remaining double jeopardy claims warrant further discussion.

## V.  DOUBLE JEOPARDY CLAUSE

The Double Jeopardy Clause of the Constitution protects a defendant from being placed in jeopardy twice for the same offense.  Washington, 434 U.S. at 503 (citing Benton v. Maryland, 395 U.S. 784 (1969)).  "The prohibition is not against being twice punished, but against being twice put in jeopardy."  Price v. Georgia,  398 U.S. 323, 326 (1970) (quoting Ball v. United States, 163 U.S. 662, 669 (1896)).  In Fifth Amendment terms, "jeopardy" denotes the risk of criminal prosecution.  Breed v. Jones,  421 U.S. 519, 528 (1975).  A criminal defendant is placed in jeopardy once the defendant is put on trial before the trier of the facts, whether jury or judge.  United States v. Jorn, 400 U.S. 470, 479 (1971).

"The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal.  The public interest in the finality of criminal judgments is so strong that an acquitted defendant may not be retried even though 'the acquittal was based upon an egregiously erroneous foundation.'"  Washington, 434 U.S. at 503 (citing Fong Foo v. United States, 369 U.S. 141, 143

28

(1962)).  Thus, where the innocence of the defendant has been confirmed by a final

judgment, there is a conclusive presumption that a second trial would be unfair.  Id.

Because jeopardy attaches before a judgment becomes final, the defendant

has a "valued right to have his trial completed by a particular tribunal."

Washington, 434 U.S. at 503.  Thus, where a trial is aborted before it is completed,

the prosecution generally is limited "to one, and only one, opportunity to require an

accused to stand trial."  Id. at 504-505.

### A.  Supreme Court Case Law on Mistrial and Double Jeopardy

The protection afforded by the Double Jeopardy Clause is less absolute in

cases of mistrial than in cases of acquittal:

> Unlike the situation in which the trial has ended in an acquittal or
> conviction, retrial is not automatically barred when a criminal
> proceeding is terminated without finally resolving the merits of the
> charges against the accused.  Because of the variety of circumstances
> that may make it necessary to discharge a jury before a trial is
> concluded, and because those circumstances do not invariably create
> unfairness to the accused, his valued right to have the trial concluded
> by a particular tribunal is sometimes subordinate to the public interest
> in affording the prosecutor one full and fair opportunity to present his
> evidence to an impartial jury.  Yet in view of the importance of the
> right, and the fact that it is frustrated by any mistrial, the prosecutor
> must shoulder the burden of justifying the mistrial if he is to avoid the
> double jeopardy bar.  His burden is a heavy one.  The prosecutor must
> demonstrate "manifest necessity" for any mistrial declared over the
> objection of the defendant.

Washington, 434 U.S. at 505.  In cases of mistrial, the "established rule" is that re-

trial is barred unless the defendant consented to the mistrial, or there was "manifest

necessity" for the mistrial.  Johnson v. Karnes, 198 F.3d 589, 594 (6th Cir. 1999);

29

Harpster, 128 F.3d at 327-328; Gilliam v. Foster, 75 F.3d 881, 893 (4th Cir. 1996) (en banc); Corey, 917 F.2d at 90.

The Supreme Court has "for the most part, explicitly declined the invitation of litigants to formulate rules based on categories of circumstances which will permit or preclude retrial." Jorn, 400 U.S. at 480.  In general, the Court has attempted to apply the principles set out by Justice Story in United States v. Perez, 22 U.S. (9 Wheat.) 579 (1824), on the situation of re-trial after a mistrial has been declared without the defendant's consent.  Id. at 480-481.

In Perez, courts are counseled to exercise "sound discretion" to declare a mistrial only in cases where there is "a manifest necessity for the act, or the ends of public justice would otherwise be defeated."  Id. at 481 (quoting Perez).  In exercising this authority, Perez instructs that "the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner."  Id.  See, e.g., Johnson, 198 F.3d at 594.

In Washington, the Supreme Court emphasized that the prosecutor has a heavy burden to "demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant."  Washington, 434 U.S. at 505.  The Court noted that "there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate."  Id. at 506.  The manifest necessity doctrine does not

30

require a reviewing court to find that the trial court had no alternative but to declare a mistrial. Harpster, 128 F.3d at 328.

The Washington Court noted that whether the requisite "high degree" had been satisfied was an easier question in some cases than in others. At one extreme are those cases where a prosecutor seeks a mistrial when it appears the evidence is insufficient to convict. Washington, 434 U.S. at 507; United States v. Stevens, 177 F.3d 579, 587 (6th Cir. 1999). At the other extreme are cases of jury deadlock, "the classic basis for a proper mistrial." Id. at 509. The decision to declare a mistrial where the jury is deadlocked is accorded great deference by a reviewing court. Id. at 510.

In Washington, the trial judge ordered a mistrial because the defense made improper and prejudicial remarks during his opening statement. Id. at 510. The Court said that, in a strict sense, the mistrial was not "necessary," but the Court recognized the propriety of according "the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." Id. at 511. The Court stated that an improper opening statement creates the risk that the entire panel may be tainted, as opposed to "individual juror bias, [where] it may be possible to replace that juror with an alternate." Id. at 512-513.

The conclusion that a particular decision to declare a mistrial is entitled to a certain level of deference does not end the inquiry:

31

> The trial judge . . . "must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." <u>United States v. Jorn</u>, 400 U.S., at 486, 91 S.Ct., at 558 (Harlan, J.).  In order to ensure that this interest is adequately protected, reviewing courts have an obligation to satisfy themselves that, in the words of Mr. Justice Story, the trial judge exercised "sound discretion" in declaring a mistrial.
>
> Thus, if a trial judge acts irrationally or irresponsibly, cf.  <u>United States v. Jorn</u>, <u>supra</u>;  <u>see</u> <u>Illinois v. Somerville</u>, 410 U.S., at 469, 93 S.Ct., at 1072, his action cannot be condoned.

<u>Id.</u> at 514.  <u>See also</u> <u>Johnson</u>, 198 F.3d at 594-595; <u>Harpster</u>, 128 F.3d at 328.

The Court in <u>Jorn</u> stressed that "the defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial."  <u>Jorn</u>, 400 U.S. at 485. In the absence of a defense motion for mistrial, the doctrine of manifest necessity "stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." <u>Id.</u>  The Court emphasized again that, "in the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." <u>Id.</u> at 486.

32

In <u>Jorn</u>, the Court affirmed the district court's dismissal, on double jeopardy grounds, of a second prosecution of a tax fraud case, after a mistrial. The Court noted that the first trial judge acted "abruptly," and found it "abundantly apparent that the trial judge made no effort to exercise a sound discretion to assure that, taking all the circumstances into account, there was a manifest necessity for the sua sponte declaration of this mistrial." <u>Id.</u> at 487.

The Sixth Circuit has gleaned a "general approach" to the question of "manifest necessity" from the Supreme Court's decision in <u>Illinois v. Somerville</u>, 410 U.S. 458 (1973):

> The Court held that "[a] trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial." These two criteria explain most, but not all, of the circumstances in which federal courts have permitted re-prosecution following a mistrial.

<u>Stevens</u>, 177 F.3d at 584 (quoting <u>Somerville</u>, 410 U.S. at 464). The first category includes cases of a hung jury, as well as "cases in which the jury is incurably tainted." <u>Id.</u> The second category covers cases of serious error which would guarantee reversal of any conviction. <u>Id.</u>

Where a trial judge has identified possible juror bias as the basis for a declaration of mistrial, that "determination is entitled to special respect." <u>Brady v. Samaha</u>, 667 F.2d 224, 228 (1st Cir. 1981) (quoting <u>Washington</u>, 434 U.S. at 510). Nonetheless, the role of a reviewing court is to ensure "that the trial judge engaged

33

in a 'scrupulous exercise of judicial discretion' in making the decision that a mistrial was necessary." Id. (quoting Jorn, 400 U.S. at 485).

Significant in that determination is whether or not the record indicates that the judge considered alternatives to a mistrial.  Id. at 229 (citing Jorn, 400 U.S. at 487, and other cases).  See also, Gilliam, 75 F.3d at 895 (appropriate consideration to alternatives less drastic than mistrial).  Also of major importance is affording counsel an opportunity to be heard on the subject.  Id. (citing Washington, 434 U.S. at 514-515 n.34, and other cases).

A major concern is "the amount of time devoted by the judge to the mistrial decision.  A precipitate decision, reflected by a rapid sequence of events culminating in a declaration of mistrial, would tend to indicate insufficient concern for the defendant's constitutional protection." Id.   (citing Jorn, 400 U.S. at 487, and other cases).  If the record reveals that the trial judge has failed to engage in a scrupulous exercise of discretion, there has been an abuse of the "sound discretion" entrusted to her. Id.

### B.  Cases Applying Supreme Court Precedent

Several circuit court cases illustrate the application of a scrupulous exercise of sound judicial discretion in determining whether a high degree of manifest necessity existed to support a mistrial.

In Brady v. Samaha, the trial court declared a mistrial where several of the defendants continually attempted to inject the "competing harms" doctrine into their

defense for criminal trespass at a nuclear power plant, after the judge had explicitly ruled that evidence inadmissible.  The First Circuit found that the actions of the trial court indicated "anything but deliberation and concern for the defendants' protected interest in completing the trial."  The court was troubled that the judge did not confer with counsel before declaring a mistrial.  In addition:

> Nor did the trial judge consider any alternatives to a mistrial, such as severance or curative instructions.  The rapid sequence of events during the morning of his final encounter with the defendants reflects a spontaneous decision that could hardly be the result of scrupulously sound discretion.  On the contrary, the apparent failure of the judge to consider alternatives and the abruptness with which he acted resemble the actions of the trial judge "that can fairly be described as erratic" denounced in United States v. Jorn.  Illinois v. Somerville, 410 U.S. at 469, 93 S.Ct. at 1073.  "(T)he pace at which the proceedings culminating in the judge's declaration of a mistrial moved indicates that the judge could not possibly have considered carefully any alternatives to declaring a mistrial.  It was only a matter of minutes...."  Granberry v. Bonner, 653 F.2d [1010,] 1015 [5th Cir. 1981].  In sum, a decision obviously made so precipitately could not have been the product of any careful consideration of the valued right of the defendants to have their guilt or innocence determined at that trial.  United States v. Jorn, 400 U.S. at 486, 91 S.Ct. at 557; Granberry v. Bonner, supra; United States v. Starling, 571 F.2d [934,] 941 [5th Cir. 1978].

Brady, 667 F.2d at 230.  The court vacated the denial of the writ.

In Johnson v. Karnes, the Sixth Circuit reversed the denial of a habeas petition because it found that "the state trial court's decision to grant a mistrial was . . . an 'unreasonable application' of the Supreme Court's 'manifest necessity' standards."  Johnson, 198 F.3d at 593.  In Johnson, the defendant was re-tried for kidnapping and felonious assault, following a hung jury on those counts.  The first

35

trial had resulted in an acquittal on aggravated robbery and aggravated burglary charges arising out of the same incident.  In the second trial, defense counsel referred, on cross-examination of the victim, to the earlier acquittal on robbery charges, and the judge declared a mistrial.  Id. at 591-592.

The Johnson court found that the trial judge did not exercise "sound discretion" in declaring that a mistrial was manifestly necessary.  Id. at 595.  The court said that the trial judge pressured the parties by only allowing "a very brief recess before listening to counsel's arguments regarding the mistrial."  The court also found that the trial court failed to seriously consider alternatives to declaring a mistrial.  Id.  The court pointed out that those cases "in which we have found that the trial judge exercised 'sound discretion' in finding that manifest necessity compelled a mistrial, the trial judge engaged in 'careful consideration and solicitude for the serious consequences attendant upon mistrials . . ."  Id. at 596 (citing cases).  The court continued:

> The care taken by the state trial judge here falls well below that exercised in the aforementioned cases.  The judge made his decision after granting only a short recess and listening to brief arguments by both parties . . .  The State failed to articulate why manifest necessity required a mistrial.  We further find it significant that the trial court judge failed to consider less drastic alternatives, but instead immediately decided that a mistrial was appropriate.
>
> * * * * *
>
> Accordingly, we believe that the trial judge failed to act rationally, responsibly or deliberately, and thus failed to exercise sound discretion as required by Perez and its progeny.

36

\* \* \* \* \*

We find that this case also lacked such "urgent circumstances" as are required to justify a mistrial.   For example, defense counsel explained that he believed that he had a legitimate basis on which to ask the question. . . . Moreover, the prosecutor merely objected to the question; he did not initially request a mistrial and he further expressed double jeopardy concerns once the trial judge intimated that he was inclined to declare a mistrial. Thus, we conclude that manifest necessity did not warrant a mistrial.

Id. at 596-597.

In Corey v. District Ct. of Vermont, the trial judge had declared a mistrial, after the sheriff in charge of the jury had improper contact with the jury during their deliberations.  The court's ruling was based on Vermont state law "requiring a new trial for a defendant convicted after the jury, during its deliberations, is exposed to misconduct by the sheriff in charge of the jury even absent any showing that the jury was affected by the misconduct."  Corey, 917 F.2d at 91.  The judge had told counsel, in chambers, that he was going to declare a mistrial, but that it should be done in open court.  Id. at 89.  At that point, before the judge and counsel had returned to the courtroom, the jury reported that it had reached a verdict.   Defense counsel then requested that the court reconsider declaring a mistrial.  Id.

The trial judge declared the mistrial, but had the verdict reported for the purpose of completing the record.  The jury reached verdicts of not guilty on every count.  The defendant's post-trial motion for acquittal was denied by the state courts.

37

Subsequently, the district court dismissed the defendant's petition for a writ of habeas corpus.  Id. at 89.

The Second Circuit reversed, finding that "manifest necessity sufficient to escape the Double Jeopardy Clause's bar of a second trial did not exist once the trial judge learned that the jury had reached a verdict and that the verdict was not guilty."  Id. at 89.  The circuit court stated that the trial judge had been prudent to raise the issue of mistrial sua sponte, but ruled that "the trial court erred, in our view, when it refused to take into consideration the change in circumstances resulting from the jury's announcement that a verdict had been reached."  Id. at 91.

The appellate court pointed out that the state did not articulate any prejudice to its own case; rather, the prosecutor stated that certain comments made by the sheriff appeared prejudicial to the defendant.  The court noted:  "Even if we could imagine some prejudice to the prosecution, the burden remains on the state to establish the basis for a finding of manifest necessity."  Id. (citing Washington, 434 U.S. at 505.)

Moreover, a "mechanistic" application of the Vermont rule was insufficient in light of the requirements of the Double Jeopardy Clause.  Id.  The court was not swayed by the fact that the trial judge had stated his intention to declare a mistrial before the jury notified the court of its verdicts.  The Second Circuit reasoned as follows:

38

When [the jury] reached its verdict, the trial judge was given a unique opportunity.  An acquittal would reveal the absence of prejudice to the defendant.  With no prejudice to the defendant and no articulation of any prejudice by the state to its case, the only remaining basis for a finding of manifest necessity would be the public interest in a trial free of even the perception of an inappropriate influence on the jury.  Nevertheless, the limited public interest in having a trial free of *all* possible taint, whether prejudicial or not, by itself cannot overcome Corey's constitutionally protected "valued right to have his trial completed by a particular tribunal."  The trial judge therefore should have accepted the verdict.  If the verdict were guilty, the court, concluding that the sheriff's conduct indeed could have prejudiced Corey, then could have properly ordered a new trial under Vermont law.   Because the verdict was not guilty, however, there was at that time no manifest necessity for the mistrial.

Id. at 91-92 (internal citation omitted).

The Second Circuit concluded:

. . . once the jury has reached a verdict before it is discharged and the prosecution does not claim prejudice, the context in which the decision regarding the existence of manifest necessity is made has substantially changed.  The trial court no longer has to speculate about the possible impact of misconduct affecting the jury.  The trial court can look to the verdict for an answer.  The failure to take into account the jury's verdict in this case constitutes an abuse of discretion.

Id. at 92.  The court reversed, and remanded with instructions to issue a writ of

habeas corpus.

## C.  Analysis of Manifest Necessity Standard

As a preliminary matter, the court notes that the parties have expended a great deal of effort to convince the court that Ross is either guilty[4] or not guilty[5] of the charges against him.[6]  This court noted in an earlier ruling, doc. 49, at 3, that Ross does not press a claim of actual innocence.  See generally Herrera v. Collins, 506 U.S. 390, 400 (1993).  This court's focus is not on whether the evidence at trial would support a jury finding of guilty or not guilty.  Rather, this court must determine whether the decision of the Ohio Court of Appeals was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d); Williams, 529 U.S. at 412-13.

Ross claims that the state court of appeals erred in reversing the trial court's grant of his motion to deny a second trial, on double jeopardy grounds.  See generally doc. 1, at 2-3.  The petition claims error by the court of appeals.  This court must focus on the appellate decision, and the issue of re-trial.  Naturally, the mistrial and the surrounding circumstances are relevant, but it is not the mistrial decision itself

---

[4]For example:  "Respondents submit to this Honorable Court that Denny Ross murdered Hannah Hill."  (Doc 33, at 5, 10-12.)

[5]For example:  "The evidence at trial was insufficient to support a conviction."  (Doc. 1, at 15-17; doc. 40, at 8-16.)

[6]In any event, the constitutional protection against double jeopardy is so strong that it would even protect an acquittal which is "based upon an egregiously erroneous foundation."  Washington, 434 U.S. at 503.

40

which is the subject of the habeas petition, but rather the appellate court decision reversing the grant of the motion to bar re-trial.

In Arizona v. Washington, the Supreme Court was not addressing the propriety of the mistrial in the context of a direct criminal appeal.  Instead, as here, the Court was resolving a petition for habeas corpus which specifically sought to bar re-trial, after a mistrial.  Thus, where the Court stated that the prosecutor has a heavy burden to "demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant," the burden does not pertain to justifying the mistrial in some abstract sense.  Washington, 434 U.S. at 505.  Rather, the Court found that "the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar" to a second prosecution and a second trial.  Id.

The first trial court (Judge Bond) declared the mistrial sua sponte.  The prosecution had no burden to support the mistrial at that point, that is, at the trial stage.  However, when the state chose to re-try Ross, it assumed the burden of demonstrating "manifest necessity" for the mistrial, in light of the importance of the Double Jeopardy Clause, in order to proceed with a second trial.  Washington, 434 U.S. at 505.  Thus, the purpose of the evidentiary hearing was not to sit in judgment on, or to somehow invalidate, the decision to declare a mistrial, but instead to resolve the motion to bar re-trial.  In that context, the relevant burden was the prosecution's, to support re-trial, not Judge Bond's to support the original mistrial.  See RX 312, at ¶ 53; Ross, 2002 WL 31890088, at *11 (Baird, J., dissenting).

41

Following that hearing, the motion to bar a re-trial on double jeopardy grounds was granted.  (Doc. 35, RX 229, at 16.)   The court of appeals reversed, finding that the visiting judge, "based on an incorrect legal standard, erred in finding that there was no manifest necessity for a mistrial." (Doc. 35, RX 312, at ¶ 52.)   Although the court of appeals identified relevant Supreme Court cases on double jeopardy, the court applied a legal standard regarding the burden of establishing "manifest necessity" contrary to that set forth in those cases.

Supreme Court precedent makes it clear that the determination of whether a person should be placed in jeopardy a second time when a criminal proceeding is prematurely ended requires an analysis that must balance competing interests and is almost always so fact specific that the exercise of sound discretion must be evaluated on a case by case basis.  The leading cases concerning mistrials entered other than at the behest of the defendant have occurred at various stages of the prosecution.  As such, the timing of the event that causes the need to consider the mistrial is a factor in determining whether the court exercised its discretion appropriately.  Here, the court of appeals appears to have failed to require the prosecution to demonstrate how the trial judge's decision to grant the mistrial was the product of manifest necessity.  Whether their failure to do so is, arguably, rendered meaningless because the court went on to evaluate the trial judge's conduct and concluded that manifest necessity was established within the meaning of

42

<u>Arizona v. Washington</u> will be further considered in Section VI of this Report and Recommendation.

The state court of appeals, in discussing the standard of review it would apply, quoted extensively from <u>United States v. Keene</u>, 287 F.3d 229, 233-234 (1st Cir. 2002).  (Doc. 35, RX 312, at ¶¶ 24-26.)  <u>Keene</u> was an interlocutory appeal of an order refusing to dismiss an indictment on double jeopardy grounds.  In <u>Keene</u>, the First Circuit cautioned that review for abuse of discretion of a motion to dismiss on double jeopardy grounds, in the wake of the declaration of a mistrial, "entails heightened rigor."  <u>Keene</u>, 287 F.3d at 233 (citing <u>Jorn</u>, 400 U.S. at 485).  The <u>Keene</u> court also affirmed that "the prosecution bears the burden of justifying the declaration of a mistrial in a criminal case."  <u>Id.</u> at 234 (citing  <u>Washington</u>, 434 U.S. at 505).

Nonetheless, the state court of appeals nowhere discussed the prosecution's burden.[7]  Ross points out that the court was required to exercise sound discretion.  <u>See</u> doc. 1, at 44-45.  Instead, the appellate court applied a more deferential abuse of discretion standard, apparently based on state law.  <u>See, e.g</u>, doc. 35, RX 312, at ¶ 22 (quoting <u>State v. Widner</u>, 68 Ohio St.2d 188, 190, 429 N.E.2d 1065  (1981), <u>cert. denied</u>, 456 U.S. 934 (1982)).  The <u>Widner</u> court had characterized the "controlling precedent" of the U.S. Supreme Court in the following terms:  ". . . the court has

_____

[7]The lower court, on the other hand, plainly stated:  "The burden is on the prosecution to establish that manifest necessity existed."  RX 229, at 12 (citing <u>Washington</u>, 434 U.S. at 505).

deferred to the trial court's exercise of discretion in light of all the surrounding circumstances." Widner, 68 Ohio St.2d at 190, 429 N.E.2d at 1066.  See, e.g, doc. 35, RX 312, at ¶ 52 (finding no abuse of discretion).  This expression of deference guided the appellate court's decision in this case.

This deferential approach is contrary to the scrutiny mandated by U.S. Supreme Court precedent.  See doc. 1, at 45-49; doc. 40, at 39-41.  In Williams, the Supreme Court pointed out that "[t]he word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'"  Williams, 529 U.S. at 406.  In other words, for the writ to issue, "the state court's decision must be substantially different from the relevant precedent of this Court."  Id.

As discussed earlier, Washington emphasized that a prosecutor has a heavy burden to demonstrate "manifest necessity," that is, a "high degree" of necessity, for the mistrial before proceeding with a second prosecution after a mistrial declared over the objection of the defendant.  Washington, 434 U.S. at 505-506.  Perez requires a court to exercise "sound discretion" before declaring a mistrial, a power which should be used only "with the greatest caution, under urgent circumstances, and for very plain and obvious causes."  Perez, 22 U.S. (9 Wheat.) at 580.  Jorn explained that "manifest necessity" involves "a scrupulous exercise of judicial discretion," which recognizes "the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a

44

tribunal he might believe to be favorably disposed to his fate." Jorn, 400 U.S. at 485-486.

The review undertaken by the court of appeals here was "substantially different" from that required by Supreme Court precedent, in the degree of deference it accorded to the mistrial determination. The court did not focus on whether the prosecutor established a manifest necessity supporting the mistrial, instead stating, for example:

> Ross and the visiting judge repeatedly emphasized the fact that the prosecution did not argue that the State's interests were at stake but spoke only of the potential prejudice to Ross, suggesting that such a failure somehow waived the State's interest or removed it from the mistrial balancing test.

RX 312, at ¶ 35.

> The fact that another trial judge may have handled the situation differently, or that, in hindsight, defense counsel would have the trial judge consider additional alternatives, does not demonstrate that the original trial judge abused her discretion in determining that a mistrial was necessary.

Id. at ¶ 52. Throughout the opinion, the focus is on what Ross argued, rather than on the prosecutor's burden.

The respondent asserts that "because the State was in the position of being the appellant to the . . . Court of Appeals, it is clear that the State had the burden of persuasion on appeal in arguing that a manifest necessity for mistrial existed." (Doc. 33, at 48.) However, the state's successful argument on appeal was that the "dismissal on double jeopardy grounds is a nullity because the first trial court acted

45

within [its] discretion by declaring a mistrial sua sponte." (Doc. 35, RX 300, at 14.)
The state urged the appellate court to apply "great deference to the trial court's
discretion." Id.  The state argued that Judge Cirigliano "did not even have the
jurisdictional authority to inappropriately second-guess the first trial court." Id. at
17.  While the state did address the issue of manifest necessity, id. at 18-19, their
appeal relied for the most part on an "abuse of discretion" standard.  The conclusion
to their brief is telling:

> . . . the second trial court's . . . ruling is a nullity because the second trial
> court lacked jurisdiction to review and reverse the first trial court's
> discretionary decision.  Furthermore, the first trial court did not abuse
> her discretion by declaring a sua sponte mistrial.

Id. at 24.

The state appellate court's application of the manifest necessity standard to
the trial court's ruling was contrary to clearly established Federal law, as determined
by the Supreme Court of the United States.  See, e.g., Washington, 434 U.S. at 505-
506 (prosecutor has heavy burden to demonstrate "high degree" of necessity); Jorn,
400 U.S. at 485-486; Perez, 22 U.S. (9 Wheat.) at 580; Keene, 287 F.3d at 233 (review
of motion to dismiss on double jeopardy grounds "entails heightened rigor"); Corey,
917 F.2d at 91 (burden on state to establish manifest necessity).  The state court's
adjudication resulted in a remand for a second trial, in violation of the petitioner's
protections under the Double Jeopardy Clause.

46

### D.  Reservation of Option to Mistrial

Ross contends that the court of appeals "acted contrary to clearly established federal law in holding that the trial court could force Petitioner to chose between his double jeopardy rights and his impartial jury rights," where there would have been no "cognizable hardship" on the prosecution.  (Doc. 1, at 53.)  Ross claims that the trial court required him to waive any error in order to proceed to a verdict.  In support of his argument he cites United States v. Dinitz, 424 U.S. 600, 610 (1976).

This issue has its basis in the defendant's request that "the jury be instructed to continue to deliberate, a verdict be rendered with the defense option of a mistrial if the decision were to be unfavorable,"  which the trial court rejected as "fundamentally unfair to the State."  (RX 292, Tr., at 1268.)  The defense had argued that "the extra judicial evidence that exists in the jury room is not evidence that is favorable to the defense and hence we believe a verdict of not guilty would not be tainted."  Id.

The court of appeals referred to this issue in its discussion of whether the trial court had adequately considered the parties' proposed alternatives.  The court found no error in the trial court's rejection of this proposal, finding that, "[b]ecause the interests of both Ross and the State were implicated by the foreperson's note," the trial court acted reasonably in considering the State's interests by so ruling.  (Doc. 35, RX 312, at ¶¶ 43-44; Ross, 2002 WL 31890088, at *8.)

47

The court's ruling is not contrary to United States v. Dinitz.  A state court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Williams, 529 U.S. at 405.  In Dinitz, the Court held that the state court's application of the manifest necessity standard to a mistrial motion where the defendant requested the mistrial was error.  Dinitz, 424 U.S. at 610.

The question in Dinitz was "whether the Double Jeopardy Clause of the Fifth Amendment was violated by the retrial of the respondent after his original trial had ended in a mistrial granted at his request." Dinitz, 424 U.S. at 601.  The Court reversed, finding that the state court erred in ruling that the retrial violated the respondent's double jeopardy rights.  Id. at 611-612.

The Supreme Court noted that "[t]he distinction between mistrials declared by the court Sua sponte and mistrials granted at the defendant's request or with his consent is wholly consistent with the protections of the Double Jeopardy Clause." Id. at 608.  The Court pointed out that "[e]ven when judicial or prosecutorial error prejudices a defendant's prospects of securing an acquittal, he may nonetheless desire 'to go to the first jury and, perhaps, end the dispute then and there with an acquittal.'" Id. (quoting Jorn, 400 U.S. at 484).  The Court also noted that "it is evident that when judicial or prosecutorial error seriously prejudices a defendant, he may have little interest in completing the trial and obtaining a verdict from the first jury." Id.

48

The obvious distinction between <u>Dinitz</u> and the case at hand is that Ross did not request a mistrial based on the juror's note which formed the basis of the trial court's ultimate ruling, but rather opposed one.  In addition, although prosecutorial misconduct was a possible source of the alleged jury taint in this case, it had not been established as such.  <u>Dinitz</u> recognized that a defendant faces "a 'Hobson's choice' between giving up his first jury and continuing a trial [which is] tainted by prejudicial judicial or prosecutorial error."  <u>Id.</u> at 609.  The court stressed that "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error."  <u>Id.</u>

As to the specific argument advanced by Ross here, the <u>Dinitz</u> Court did not hold that a defendant could request that the jury continue to a verdict in the manner requested by Ross, that is, reserving the option for a mistrial dependent on the outcome of the jury deliberations.  Thus, this court cannot find that the state court's contested ruling contradicted the governing law set forth in <u>United States v. Dinitz</u>.

### VI.  UNREASONABLE APPLICATION

Ross contends that the state court's application of federal law was "objectively unreasonable" because the court failed to properly apply the correct rules of law.  (Doc. 1, at 60-61.)  A state court decision is not "unreasonable" simply because this court considers the  decision to be erroneous or incorrect.  Rather, in order to grant habeas relief, this court must find that the state court decision is an objectively

unreasonable application of federal law.  <u>Williams</u>, 529 U.S. at 410-12; <u>Lorraine</u>, 291 F.3d at 422.

Where a trial judge has identified juror bias as the basis for a mistrial, that determination is entitled to "special respect."  <u>Washington</u>, 434 U.S. at 510; <u>Brady</u>, 667 F.2d at 228.  Still, the role of a reviewing court is to ensure that the judge engaged in a "scrupulous exercise of judicial discretion" in making the decision that a mistrial was necessary."  <u>Jorn</u>, 400 U.S. at 485; <u>Brady</u>, 667 F.2d at 228.  If the record reveals that the trial judge has failed to engage in a scrupulous exercise of discretion, there has been an abuse of the "sound discretion" entrusted to her.

The court of appeals criticized the second trial judge's decision to consider information adduced during the hearing on the defendant's motion to dismiss based upon double jeopardy considerations.  The court went on to ignore any evidence discovered after the first trial judge announced her declaration of mistrial to the parties and their counsel.  <u>See, e.g.</u>, RX 312, at ¶ 40 n.3; <u>Ross</u>, 2002 WL 31890088, at *7 n.3 (court will not consider "information that was discovered after the mistrial was declared").  Under the facts of this case, the determination of whether manifest necessity existed required more.  This is so because, even though the principles to be applied remain the same, the totality of the trial judge's conduct undermines a conclusion that the court sufficiently balanced the competing interests at stake in this case.

While the petitioner lodges several accusations concerning the trial court's motive which this court finds to be without merit, the fact remains that analysis of the mistrial decision requires more scrutiny than that given by the court of appeals. There is little question that the trial judge, confronted with a very difficult situation, attempted to sort out the dilemma presented by the content of the note received from the jury.  The second trial judge conducted a hearing to consider the defendant's motion to dismiss on double jeopardy grounds.  The court of appeals criticized the scope of that hearing, and determined that the second trial judge employed an incorrect legal standard.  As a result, the court of appeals refused to consider any evidence developed during the hearing.  Ultimately, under the totality of factors present in this case, this refusal proves unreasonable.

### A.  Timing of mistrial decision

The amount of time devoted to the mistrial decision is an important component of the analysis.  A precipitate decision, reflected by a rapid sequence of events leading to the declaration of mistrial, indicates insufficient concern for the defendant's constitutional double jeopardy interests.  Jorn, 400 U.S. at 487; Brady, 667 F.2d at 229.  The state court of appeals commented:  "Although the visiting judge concluded that the original trial judge had rushed to judgment without thoroughly considering the alternatives available, that conclusion was not supported by the record of what transpired on October 28, 2000."  (Doc. 35, RX 312, at ¶ 40.)

51

Here, the evidence shows that the judge received the note from the juror sometime after the jury took their lunch break.  At the evidentiary hearing, in response to a question as to whether the note had been received at approximately 2:00 p.m., the judge said that it was received "[s]ometime in mid-afternoon."  (Doc. 35, RX 294, at 88, 115.)  As a result of receiving the note, counsel were called into the judge's chambers, and several alternatives were discussed.  Id. at 89-91.  The court then gave counsel an opportunity to consult with their colleagues and the parties.  (Doc. 35, RX 292, at 1265-1266.)  The record reflects that the proceedings resumed in court at 3:40 p.m.  Id. at 1264.  After some discussion on the record, the court declared the mistrial, and court was adjourned at 4:00 p.m.  Id. at 1279.  Thus, the time that had elapsed from the receipt of the note was approximately two hours.

Relevant to the consideration of time is the manner by which the trial court handled the defendant's pending motion for mistrial, with prejudice, on the allegedly improper closing argument by the prosecution.  This motion was made previous to the issue of the juror's note arising, and a decision on this pending motion could have rendered the subsequent juror misconduct issue moot.  See doc. 40, at 30.  When Ross initially asked for a ruling on his motion, the court responded that the motion was not "ripe," because the prosecutor had not had "a full or fair opportunity to respond" to the motion.  (Doc. 35, RX 292, at 1267-1268.)  Rather than require the prosecutor to respond orally, within the two-hour period allowed to the parties on the juror misconduct issue, the court apparently was willing to grant the prosecutor time for

52

fuller consideration, and to delay a ruling on the defendant's motion regarding prosecutorial misconduct.

More importantly, while the original decision to defer ruling might reasonably be viewed as appropriately responsive to the gravity of the issue at stake, a short time later, and without explanation, the trial court appeared to have abandoned its decision to defer ruling in favor of declaring a mistrial, sua sponte over defendant's objection, as revealed in the following excerpt from the transcript of the proceedings conducted on October 28, 2000.

> MR. PANCER:  Our next request is a mistrial with prejudice.
>
> THE COURT:  And the basis for that?
>
> MR. PANCER:  The basis for that is the motions that we have previously filed in this case, the motion we have filed with this Court and all the grounds that might have given rise to a mistrial motion, Your Honor, including the question — including the information contained in the taped statement of Denny Ross.
>
> THE COURT:  And so you're essentially renewing your previous motions for this Court?
>
> MR. PANCER:  Yes, in the context of this hearing.
>
> THE COURT:  All right, sir.  Motion is overruled.

(RX 292, Tr., at 1269.)

## B.  Defendant's Consent

The respondents claim that "Ross never once offered a contemporaneous objection to the mistrial."  (Doc. 47, at 18.)  The Sixth Circuit has refused to infer

53

consent merely because a defendant did not object to the declaration of a mistrial. "Rather, a defendant's failure to object to a mistrial implies consent thereto only if the sum of the surrounding circumstances positively indicates this silence was tantamount to consent." United States v. Gantley, 172 F.3d 422, 429 (6th Cir. 1999) (citing Glover, 950 F.2d at 1240).

Here, Ross made it clear that he did not consent to a mistrial without prejudice. In light of the comments made by counsel for Ross ("He does not want to have a mistrial . . . on that particular ground"), and Ross himself ("I don't want a mistrial"), the court will not imply consent to the mistrial simply because Ross failed to formally object to the court's mistrial declaration, which occurred several minutes after those comments were made. (Doc. 35, RX 292, Tr., at 1270.) However, the appellate court's decision is under review, and that decision did not turn on the issue of consent, so that issue is not properly before the court.

<u>C. Alternatives to Mistrial</u>

Significant as well is whether or not the record indicates that the judge considered alternatives to a mistrial. Jorn, 400 U.S. at 487; Brady, 667 F.2d at 229. The petitioner contends that the judge did not give sufficient consideration to the double jeopardy implications of a mistrial. (Doc. 1, at 61-62; doc. 40, at 50-51.) Ross emphasizes that the judge testified that she was unfamiliar with the concept that the defendant may wish to go to the jury despite "judicial or prosecutorial error prejudicing a defendant's prospects of securing acquittal." Id. at 50 (quoting H.Tr., at

54

159.)  However, the record also shows that the parties discussed a number of

alternatives with the judge in chambers, including, seating an alternate juror; voir

dire of the jury; allowing the jury to finish deliberating; and declaring a mistrial.

(Doc. 35, RX 294, at 90-91.  See also RX 312, at ¶¶ 40-49.)  The record also reflects

that the court afforded counsel an opportunity to be heard on the subject.  See, e.g.,

Washington, 434 U.S. at 514-515 n.34; Brady, 667 F.2d at 229.

As already noted in the previous discussion on "manifest necessity," the

Second Circuit in Corey recognized an alternative which the judge in this case did

not pursue.  The Corey court reasoned that, once the judge became aware of a jury

verdict, the court "no longer has to speculate about the possible impact of misconduct

affecting the jury.  The trial court can look to the verdict for an answer."  Corey, 917

F.2d at 92.  In this case, although the judge had been informed of the verdict, and

the jury had not yet been actually dispersed[8], the court decided that the verdict was

a nullity.

Although the court had orally declared a mistrial, that fact was not a bar to

reconsideration before judgment was entered.  A recent case in the Ohio Court of

Appeals is instructive in regard to the alternatives to a mistrial available under Ohio

state law.  In State v. Stewart, No. 2001-P-0035, 2002 WL 31886657 (Ohio Ct. App.

---

[8] "Until the jury is actually discharged by separating or dispersing (not merely
being declared discharged), the verdict remains subject to review."  United States v.
Marinari, 32 F.3d 1209, 1214 (7th Cir. 1994).

55

Dec. 27, 2002), the trial court initially declared a mistrial, after misunderstanding the jury's communication that it was deadlocked. The court had orally declared a mistrial and dismissed the jury. A few minutes after the jury had been dismissed, it was discovered that the jury in fact had reached verdicts on three charges (although it had deadlocked on the firearm specifications). The jury was called back into the courtroom, the verdicts were read and accepted, and a mistrial was declared solely on the firearm specifications. Stewart, 2002 WL 31886657, at *2.

The defendant appealed, arguing that the trial court violated state law by accepting the jury's (guilty) verdicts after the mistrial had been declared and the jury dismissed. The court of appeals rejected that argument. The court stated that: "The trial court's mistaken oral declaration of a mistrial did not actually result in a mistrial because a mistrial judgment was never journalized." The court relied on Schenley v. Kauth, 160 Ohio St. 109, 113 N.E.2d 625 (1953) (syllabus), which held that: "A court of record speaks only through its journal and not by oral pronouncement or mere written minute or memorandum."

The Stewart court also rejected the defendant's argument that "the trial court erred by overruling her motions for a mistrial on the grounds of improper communications with jurors." The court noted controlling state and federal law:

> In State v. Phillips (1995), 74 Ohio St.3d 72, 656 N.E.2d 643[, cert. denied, 517 U.S. 1213 (1996)], the Supreme Court of Ohio set forth the procedure and applicable law a court must follow when an allegation is made that an improper communication has occurred with one or more members of the jury. "When a trial court learns of an improper outside

56

communication with a juror, it must hold a hearing to determine whether the communication biased the juror." (Emphasis added.) Id. at 88, 656 N.E.2d 643, citing <u>Smith v. Phillips</u> (1982), 455 U.S. 209, 215-216, 102 S.Ct. 940, 71 L.Ed.2d 78 ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.") and <u>Remmer v. United States</u> (1954), 347 U.S. 227, 229- 230, 74 S.Ct. 450, 98 L.Ed. 654 ("The trial court should not decide and take final action ex parte * * * but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."). See, also, <u>State v. Johnson</u> (2000), 88 Ohio St.3d 95, 107, 723 N.E.2d 1054[, <u>cert. denied</u>, 531 U.S. 889 (2000)].

<u>Stewart</u>, 2002 WL 31886657, at *4 (quoting <u>State v. Henderson</u>, No. 99-T-0001, 2000 WL 1459858 (Ohio Ct. App. Sept. 29, 2000)). The court also stated that "courts have broad discretion in determining whether to grant a mistrial or replace a juror when instances of improper communication with jurors are alleged." <u>Id.</u> (citing <u>Johnson</u>, 88 Ohio St.3d at 107, 723 N.E.2d 1054). In <u>Stewart</u>, the court found that the jurors were properly instructed, and that the communications at issue were not improper or prejudicial, thus the court was not required to hold a hearing on juror bias. <u>Id.</u> at *5.

Thus, <u>Stewart</u> indicates that the court's oral declaration of a mistrial was not, under state law, a final judgment because "[a] court of record speaks only through its journal and not by oral pronouncement." <u>Schenley</u>, 160 Ohio St. 109, 113 N.E.2d 625. The court was not precluded from further consideration of the mistrial after the jury verdicts were discovered simply because an oral declaration of mistrial had been made.

D.  Analysis of Unreasonable Application of Federal Law

This court grants habeas relief under the "unreasonable application" clause only when the state court has identified the correct legal principle from Supreme Court precedent, but the state court's decision is an objectively unreasonable application of that federal law.  Williams, 529 U.S. at 410-13.  The Supreme Court has stressed that an objectively unreasonable application is different from an incorrect one.  Bell v. Cone, 535 U.S. 685, 694 (2002).

In his petition, Ross does not identify the governing legal principle(s) set forth by the Supreme Court which he contends that the state court has applied unreasonably.  See doc. 1, at 60-61; doc. 40, at 49.  However, Ross argues that the state courts failed to exercise sound discretion, contrary to Supreme Court precedent.  (Doc. 1, at 44-45.)

The Ohio Court of Appeals apparently considered the trial court's oral declaration of a mistrial to be final and beyond reconsideration, even after crucial relevant facts (completed verdict forms) were discovered by the trial judge on the very afternoon of her oral ruling.  The appellate court characterizes these facts as "information that was not before the trial judge at the time she made her decision." (Doc. 35, RX 312, at ¶ 13; Ross, 2002 WL 31890088, at *2.)  However, the court acknowledged that the trial court orally declared a mistrial on October 28, 2000, but did not journalize the declaration of a mistrial until November 2, 2000.  (RX 312, at ¶ 10; Ross, 2002 WL 31890088, at *2.)

58

The U.S. Supreme Court in <u>Arizona v. Washington</u> emphasized that a prosecutor has a heavy burden to demonstrate "manifest necessity," that is, a "high degree" of necessity, for the mistrial before proceeding with a second prosecution after a mistrial declared over the objection of the defendant. <u>Washington</u>, 434 U.S. at 505-506.  "Manifest necessity" involves "a scrupulous exercise of judicial discretion," which recognizes "the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." <u>Jorn</u>, 400 U.S. at 485-486.

The Supreme Court has instructed that the court's power to declare a mistrial "ought to be used with the greatest caution, . . . and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner." <u>Perez</u>, 22 U.S. (9 Wheat.) at 580.  Where the trial court discovers that verdicts have been reached, the defendant's "valued right to have his trial completed by a particular tribunal," <u>Washington</u>, 434 U.S. at 503, is even more strongly implicated. <u>See, e.g.</u>, <u>Corey</u>, 917 F.2d 88.

A proper exercise of "sound discretion" in finding manifest necessity for a mistrial exists where the trial judge engages in "careful consideration and solicitude for the serious consequences attendant upon mistrials." <u>Johnson</u>, 198 F.3d at 596 (citing cases).  In this case, the trial judge's consideration and solicitude for the serious consequences of a mistrial was ultimately unreasonable, in her balancing of the sensitive interests at stake in this capital case.

59

It was unreasonable for the court of appeals to assume that the trial judge was foreclosed from giving fuller consideration to her mistrial decision in light of the facts which were discovered after her ruling from the bench.  The Ohio Supreme Court addressed the finality of oral rulings from the bench in Schenley, 160 Ohio St. 109, 113 N.E.2d 625 (syllabus), which held that:  "A court of record speaks only through its journal and not by oral pronouncement or mere written minute or memorandum." The Ohio Supreme Court has followed Schenley in a variety of circumstances over the years.  See State ex rel. Marshall v. Glavas, 98 Ohio St.3d 297, 297-298, 784 N.E.2d 97, 98-99 (2003) (citing Schenley) (any oral pronouncements by judge subject to revision before journalization); State v. Keenan, 81 Ohio St.3d 133, 154, 689 N.E.2d 929, 948 (1998), cert. denied, 525 U.S. 860 (1998) (citing Schenley) (judge's statement from bench, not incorporated into journal entry, has no force);  Atkinson v. Grumman Ohio Corp., 37 Ohio St.3d 80, 82-83, 523 N.E.2d 851, 854 (1988) (citing Schenley) ("not inconceivable" that judge in any case might change mind between time of announcing decision and  filing of judgment entry).  See also State v. Vickers, No. 01CA007928, 2002 WL 1598130, at *3 (Ohio Ct. App. July 17, 2002) (Carr, J.) ("a court speaks only through its journal entries"); Robinson v. Clarke, 939 F.2d 573, 577 (8th Cir. 1991) (trial court's oral ruling has no final or binding effect unless formally incorporated into judgment).  Here, several days elapsed between the court's oral declaration on Saturday, Oct. 28, and the journalization on Thursday, Nov. 2.

Relying on Schenley, for example, the court of appeals in State v. Stewart, found that a trial court was not precluded from further consideration of a mistrial ruling after jury verdicts were discovered, simply because an oral declaration of mistrial had been made.  Stewart, 2002 WL 31886657.  The Ohio Supreme Court declined the opportunity to review this ruling.  State v. Stewart, 98 Ohio St.3d 1567, 787 N.E.2d 1231 (2003).

Obviously, once the trial judge had followed her declaration of mistrial from the bench with her ill-conceived solo entry into the jury room, there is no question that the jury could not continue to deliberate further.  The question becomes:  What was the proper course of conduct once the court discovered that the jury had reached verdicts, as it emerged, on the three most serious felony counts?  Reasonable minds could conceive of several sensible alternatives; denying any consideration whatsoever to this relevant information is not among them.

The Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."  Smith v. Phillips, 455 U.S. 209, 215 (1982) (citing Remmer v. United States, 347 U.S. 227 (1954)).  The Court rejected the argument that the law must impute bias to jurors, rather than confronting the allegations of bias in a hearing.  Id.  The Court has stated that a trial judge "should not decide and take final action ex parte" on allegations of bias, "but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested

61

parties permitted to participate."  <u>Remmer</u>, 347 U.S. at 229-230.  The Court found
that a post-trial hearing was sufficient to decide allegations of juror partiality.
<u>Smith</u>, 455 U.S. at 217-218.

     In this case, although the judge had entered the jury room to discharge the
jury, they had not been dispersed.  After the judge was informed of the signed verdict
forms, the twelve jurors were still together in the courthouse.  (Doc. 35, RX 293, at 66-
68, 76.)  "Until the jury is actually discharged by separating or dispersing (not
merely being declared discharged), the verdict remains subject to review."  <u>Marinari</u>,
32 F.3d at 1214.

     The trial had lasted approximately one month during which the defendant on
multiple occasions had rejected the court's offer to begin with a new jury in response
to something that was, arguably, to his potential detriment.  <u>See, e.g.</u>, RX 294, at 99-
101.  In addition, the defendant chose to rest without putting on evidence, and
further demonstrated his belief that the jury may have been disposed in his favor, by
opposing the potential hazard of voir diring the jury during deliberations.  Nothing
on the face of the juror's note suggested any impropriety by the defense and no
prejudice to the prosecution was claimed.  Under the circumstances then present, it is
inconceivable that the proper respect for the public interest in fair, unbiased jury
trials would be undermined by a hearing on whether the verdicts should stand;
rather, that public interest would be vindicated.

The trial court was presented with the opportunity to make factual findings on whether the verdicts reached were viable or tainted. Although the trial court spoke in absolutes when announcing her oral declaration of mistrial (" . . . there is corruption of a juror . . . Court finds that this jury cannot render a fair and impartial verdict in accordance with the law"), it is clear that all the participants understood that the note merely "suggested" or was an "indication" that the jury may have been "tainted." (RX 292, Tr., at 1276.)

Once the judge learned of the signed verdict forms, a proper consideration of the defendant's double jeopardy interests mandated a reconsideration of her initial mistrial ruling. Although the judge did not journalize her ruling until five days later, there is no indication in the record that she gave any further consideration to the additional fact of the signed verdict forms, which had been made known to her less than one hour after her ruling from the bench.

Another indication of the lack of proper concern for the double jeopardy interests at stake comes in the handling of the potential that the jury was allegedly exposed to information concerning the results of a polygraph examination of another suspect. During her colloquy with the defendant, seeking to gain his acceptance of a mistrial, the court stated that "at least one juror believes you're guilty based upon . . . evidence that was not presented during trial." (RX 292, at 1270-1271.) The potential implication of how this information may have made its way into the jury room on the question of mistrial and possible retrial should have been obvious.

63

Indeed, the defendant specifically responded to the trial court's assertion that no impropriety by either side had been alleged, by reserving its desire to have the issue explored with the jury before they were dispersed.  (RX 292, Tr., at 1275.)  The trial court clearly understood the potential;  however, the jury was allowed to disperse without any inquiry on the issue.  (RX 294, at 135, 186.)

It is well-settled that the principles which govern whether a defendant can twice be placed in jeopardy for the same offense following the sua sponte mistrial, i.e., whether manifest necessity existed, cannot be applied mechanistically, but rather must be determined in contemplation of the particular facts facing the court in question.  Here, while reasonable jurists may differ as to whether manifest necessity existed at the point of the trial judge's oral declaration of the mistrial, the Ohio Court of Appeals completely disregards the fact that the trial judge obtained relevant information at a time when she retained the ability to explore other options before finalizing such a drastic result in a capital case.

The combination of factors discussed above (VI.A. - VI.D.) does not inspire confidence that the state courts fully appreciated the double jeopardy implications of a mistrial, given the trial court's comments and conduct leading up to and following the oral mistrial declaration and their treatment by the Ohio Court of Appeals. It well may be that this conclusion could have been avoided had the trial court allowed itself and the parties more time to research the mistrial implications in light of relevant Supreme Court jurisprudence. Certainly, given all that was at stake at this

critical juncture, no legitimate interest was served by failing to do so.  Having

allowed more time for research, it is difficult to imagine that same result would have

obtained, thereafter, at least not without providing a record which could support that

result, unlike the record here.

Under the totality of the circumstances of this case the court's conduct fell

short of the "scrupulous exercise of judicial discretion" which the Supreme Court

requires in a mistrial situation of this sort.  Jorn, 400 U.S. at 485-486.  As such, this

court finds that the decision of the Ohio Court of Appeals on this issue involved an

unreasonable application of clearly established Federal law.


## VII.  DUE PROCESS VIOLATION

Ross asserts that the court of appeals violated the Due Process Clause, by

rendering an arbitrary decision, in two important respects:

> First, the appellate majority repeatedly criticized the visiting judge for
> conducting an evidentiary hearing, and ruled that holding the
> evidentiary hearing was legal error.  Second, the appellate majority
> faulted the visiting judge for conducting a substantive review of the
> mistrial declared by the trial judge, claiming that the visiting judge
> "seemed to view his role as that of an appellate court."

(Doc. 1, at 39.)  Although Ross claims that he is not relying on an error of state law,

id. at 40 n.17, his argument that the appellate court's legal conclusions are not

supported by "a single case in Ohio jurisprudence," and his extensive citation of Ohio

case law[9] would seem to compel the conclusion that he is, in fact, arguing that the state court erred in its application of state law.  Federal habeas relief is not available for a claimed violation of state law.  Lewis v. Jeffers, 497 U.S. 764, 780 (1990).

In addition, Ross relies on Rogers v. Tennessee to argue that the state court's decision was arbitrary.  Rogers involved the appeal of a murder conviction, in which the Tennessee Supreme Court abolished the state's common-law "year-and-a-day" rule for murder.  Rogers, 532 U.S. at 453-455.  The Supreme Court affirmed, holding that there was nothing in the Tennessee court's abolition of the rule which represented "an exercise of the sort of unfair and arbitrary judicial action against which the Due Process Clause aims to protect."  Id. at 467.  The Court contrasted Tennessee's "routine exercise of common law decisionmaking" against an unacceptable "marked and unpredictable departure from prior precedent."  Id.

The procedural context of Rogers is critical here.  Rogers was a direct criminal appeal, which entails a distinctly less deferential standard of review than that mandated by the AEDPA in habeas cases.  Rogers is inapposite.  The court will not

---

9Ross contends that Ohio precedent establishes that he was entitled to an evidentiary hearing, and review on the merits, of his motion.  (Doc. 40, at 36.)  The case law cited by Ross demonstrates, at a minimum, that a hearing before an independent judge of a motion to dismiss on grounds of double jeopardy is not extraordinary.  See, e.g., State v. Williams, No. CA89-04-019, 1989 WL 152700, at *1 (Ohio Ct. App. Dec. 18, 1989) (per curiam); State v. Lewis, No. CA-7613, 1989 WL 47956, at *1 (Ohio Ct. App. Apr. 17, 1989); State v. Aldridge, 3 Ohio App.3d 74, 75, 443 N.E.2d 1026, 1028 (Ohio Ct. App. 1981).

undertake an analysis of the correctness of the state court's application of state law precedent.  The petition will not be granted on due process grounds.

## VIII.  UNREASONABLE DETERMINATION OF THE FACTS

Ross argues that the appellate court's conclusion that the lower court sufficiently considered his double jeopardy interests before declaring a mistrial was "an unreasonable determination of the facts in light of the evidence presented at the state court [evidentiary] proceeding."  Doc. 1, at 61-64 (citing Wiggins, 539 U.S. at 527-529).

The factual findings made by the state courts are presumed correct, and the presumption of correctness may be rebutted by the petitioner only with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  See, e.g., Lorraine, 291 F.3d at 422; Warren v. Smith, 161 F.3d 358, 360-361 (6th Cir. 1998), cert. denied, 527 U.S. 1040 (1999).  Under the AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct," 28 U.S.C. § 2254(e)(1), and that presumption of correctness extends to factual findings of a state appellate court based on the state trial record.  Bowling v. Parker, 344 F.3d 487, 497 (6th Cir. 2003), cert. denied, 125 S.Ct. 281 (2004) (citing Sumner v. Mata, 449 U.S. 539, 546-47 (1981)).  The presumption was designed to relieve federal courts of the necessity of relitigating factual issues concerning federal rights claimed by a habeas petitioner when such factual determinations have already been made by the state court at trial where the

67

defendant had adequate opportunity to present evidence. <u>United States ex rel. Preston v. Mancusi</u>, 422 F.2d 940, 943 (2d Cir. 1970); <u>Maxwell v. Turner</u>, 411 F.2d 805, 807 (10th Cir. 1969).

In <u>Wiggins</u>, the petitioner established that the lower court had based a conclusion, in part, on a clear factual error. <u>Wiggins</u>, 539 U.S. at 528-529. The lower court had found that relevant social service records included incidents of sexual abuse, when in fact "the records contain no mention of sexual abuse." The court found that the state court's assumption that the records documented evidence of abuse was shown to be incorrect by "clear and convincing evidence." <u>Id.</u>

In contrast, Ross attempts to establish that the trial court's consideration of his double jeopardy interests, when declaring a mistrial, was insufficient, and that the appellate court's finding that such consideration was sufficient was "an unreasonable determination of the facts." (Doc. 1, at 61.) Similarly, Ross urges that the court of appeals erred in concluding a juror must have disregarded the trial court's instructions. <u>Id.</u> at 62-63.

Ross raises plausible doubts regarding the state court's determinations on these issues. This court is hesitant, however, to characterize issues such as the sufficiency of the trial court's weighing of the petitioner's double jeopardy interests as "factual determinations." Assuming for the sake of argument that they are factual determinations, Ross has failed to present clear and convincing evidence to rebut the presumption of correctness.

The petition will not be granted on the ground that the state courts made an unreasonable determination of the facts.

## IX.  MOTION TO PERFECT THE VERDICTS

The additional claim in the amended petition is that a second prosecution of Ross "will violate his right against double jeopardy guaranteed by the Fourteenth Amendment because the State of Ohio refuses to acknowledge that Petitioner has been lawfully acquitted." (Doc. 57, at 62.)  The basis of this claim is that the trial court had denied his motion to perfect the verdicts, because the jury had been discharged prior to the verdicts being given to the court.  (Doc. 35, RX 251.)  Ross argues that the trial court acted contrary to clearly established federal law in denying his motion, and that there is no lawful basis for "invalidating the acquittals." (Doc. 57, at 64.)

The petitioner claims that "the absence of an entry of judgment has no effect whatsoever on the validity of an acquittal for the purposes of the Double Jeopardy Clause." (Doc. 40, at 21; doc. 57, at 65.)  He cites Green v. United States, which stated that "a verdict of acquittal is final, ending a defendant's jeopardy, and even when not followed by any judgment, is a bar to a subsequent prosecution for the same offence." Green v. United States, 355 U.S. 184, 188 (1957) (citing Ball v. United States, 163 U.S. 662, 671 (1896)).  The Court pointed out that "it is one of the elemental

69

principles of our criminal law that the Government cannot secure a new trial by means of an appeal even though an acquittal may appear to be erroneous." <u>Id.</u>

The respondent states that, under Ohio law, a jury has not reached a proper verdict until deliberations are over, the result is announced in open court, and no dissent by a juror is registered.  (Doc. 55, at 9, citing <u>State v. Sneed</u>, 63 Ohio St.3d 3, 584 N.E.2d 1160 (1992)).  Ohio Criminal Rule 31(A) provides:  "The verdict shall be unanimous.  It shall be in writing, signed by all jurors concurring therein, and returned by the jury to the judge in open court."

The corresponding federal rule is similar:  "The jury must return its verdict to a judge in open court.  The verdict must be unanimous."  Fed. R. Crim. P. 31(a).  The federal rule also requires a poll of the jury:  "After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually.  If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury."  Fed. R. Crim. P. 31(d).  <u>See, e.g.</u>, <u>United States v. Love</u>, 597 F.2d 81, 85 (6th Cir. 1979) (quoting <u>United States v. Taylor</u>, 507 F.2d 166, 168 (5th Cir. 1975)) (jury has not reached valid verdict until deliberations are over, result announced in open court, and no dissent is registered).

A verdict is not final when it is announced; the parties must be given an opportunity to request a poll of the jury before the verdict is recorded.  <u>Marinari</u>, 32 F.3d at 1212; <u>Love</u>, 597 F.2d at 84.  Federal courts have held that reliance on verdict

forms signed by all jurors in the jury room cannot substitute for an oral poll of the jury in open court.  Marinari 32 F.3d at 1212 -1213; United States v. Causor-Serrato, 56 F.Supp.2d 1092, 1094 (N.D. Iowa 1999).

Ross claims to find support for his proposition that "mere procedural irregularities do not in any way undermine the enforceability of an acquittal" under the Constitution in Green v. United States and Ball v. United States.  In Ball, the Supreme Court upheld an acquittal after a trial based on a faulty indictment which was not objected to prior to the verdict.  Ball, 163 U.S. at 670-671.  The verdict was also valid even though it was returned on a Sunday.  Id. at 671.  Unlike this case, the verdict was apparently delivered by the jury in open court.  Id. at 664.  The "mere procedural irregularities" at issue in Ball did not involve the finality of the verdict itself.

In Green, the defendant's first trial resulted in a jury finding of guilty as to charges of arson and second degree murder, but the jury verdict was silent as to the charge of first degree murder.  He appealed the second degree murder conviction, which was reversed on appeal as unsupported by the evidence at trial.  On remand, Green was tried again for first degree murder under the original indictment, over his objection on double jeopardy grounds.  After the second trial, he was convicted of first degree murder.  Green, 355 U.S. at 186.  The Supreme Court found that the defendant's second trial for first degree murder violated the Double Jeopardy Clause. Id. at 190.

71

The <u>Green</u> Court found that "it is not even essential that a verdict of guilt or innocence be returned for a defendant to have once been placed in jeopardy so as to bar a second trial on the same charge."  <u>Id.</u> at 188.  The Court noted that "a defendant is placed in jeopardy once he is put to trial before a jury so that if the jury is discharged without his consent he cannot be tried again."  At the same time, the Court recognized that a second trial is not barred when "unforeseen circumstances" arise during the first trial which prevent its completion.  <u>Id.</u> (citing <u>Wade v. Hunter</u>, 336 U.S. 684, 688-689 (1949)).  <u>Green</u> does not speak to the validity of the verdicts under the circumstances of this case.

Ross also cites <u>United States v. DiFrancesco</u>, 449 U.S. 117 (1980), for the concept that "[t]he exaltation of form over substance is to be avoided," and that it is the substance of the action that is controlling, not its label.  (Doc. 57, at 65, quoting <u>DiFrancesco</u>, 449 U.S. at 142.)  In <u>DiFrancesco</u>, the government had appealed the length of the sentence given to the defendant.  The Court found that "[t]he double jeopardy considerations that bar reprosecution after an acquittal do not prohibit review of a sentence."  <u>Id.</u> at 136.

In essence, Ross argues that the verdict forms should have been recognized as valid  acquittals by the state court, despite the "trivial procedural deficiency" that the purported verdicts had not been announced in open court, and the parties had not been given an opportunity to request a poll of the jury.  (Doc. 57, at 65-66.)  For this specific claim, he is unable to point to any Supreme Court ruling on point, but

72

rather resorts to cobbling together dicta from various decisions of varying relevancy. Ross has failed to demonstrate that the state court adjudication of his motion to perfect the verdicts resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  The petition will not be granted on that basis.


## X.  SUMMARY

The amended petition for habeas corpus (doc. 1, 57) should be granted.  For the several reasons outlined above, this court finds that the decision of the Ohio Court of Appeals was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d); <u>Williams</u>, 529 U.S. at 412-13.  The state court's adjudication resulted in a remand for a second trial, which would violate the petitioner's protections under the Double Jeopardy Clause.

## <u>RECOMMENDATION</u>

It is recommended that the petition be granted.

Dated:  May 3, 2005         /s/ Kenneth S. McHargh
                                       Kenneth S. McHargh
                                       United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the District Court's

order.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).