DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Denny Ross, | ) | |
| | ) | CASE NO. 5:04 CV 0849 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| Jim Petro, et al. | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        1. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        2. This Court's Task . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    B. *De Novo* Analysis of Objections to the R&R . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        1. Respondent's Objections (Doc. No. 61) . . . . . . . . . . . . . . . . . . . . . . . . . 18
            a. Determination of "manifest necessity" . . . . . . . . . . . . . . . . . . . . . . 19
                1) Protecting the ends of public justice . . . . . . . . . . . . . . . . . . . 21
                2) Improper application of State law . . . . . . . . . . . . . . . . . . . . . 25
                3) Appeals Court decision deemed erroneous and incorrect . . . . 26
                4) Conclusion re: Manifest Necessity . . . . . . . . . . . . . . . . . . . . 26
            b. The *Harpster* exception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        2. Petitioner's Objections (Doc. No. 60) . . . . . . . . . . . . . . . . . . . . . . . . . . 29
            a. Prosecution following acquittal . . . . . . . . . . . . . . . . . . . . . . . . . . 29
            b. Arbitrary decision in violation of *Rogers v. Tennessee* . . . . . . . . . . 30
            c. No right to an evidentiary hearing . . . . . . . . . . . . . . . . . . . . . . . . 31
            d. Forcing a choice between constitutional rights . . . . . . . . . . . . . . . . 32
            e. Unreasonable determination of the facts . . . . . . . . . . . . . . . . . . . . 34

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

(5:04 CV 0849)

## I.  INTRODUCTION

Before the Court is the Report and Recommendation ("R&R") of Magistrate Judge

Kenneth S. McHargh that the above-captioned petition for writ of habeas corpus under 28 U.S.C.

§ 2254 be granted.  (Doc. No. 59).  Pursuant to Fed. R. Civ. P. 72, both Petitioner and

Respondents (hereafter referred to in the singular as "Respondent") have timely filed objections

to the R&R.  (Doc. Nos. 60 and 61).  Respondent has also filed a response to Petitioner's

objections.  (Doc. No. 62).

Having conducted the *de novo* review as to those portions of the R&R to which written

objections have been made, the Court concludes that the adjudication in the State courts "resulted

in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States[.]"  28 U.S.C. §

2254(d)(1).  Accordingly, the petition for writ of habeas corpus is GRANTED.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

No objections have been filed with respect to the recitation of the factual and procedural

background set forth in the R&R.  However, the Court repeats that background here in

considerable detail so as to contextualize this opinion.[1]

Petitioner Ross (sometimes also referred to herein as "defendant") was arrested on May

27, 1999 in connection with the murder of Hannah Hill.  On June 10, 1999, he was indicted on

charges of aggravated murder, rape, kidnapping, tampering with evidence, and abuse of a corpse.

---

[1]  Some of the facts set forth here and in the R&R were gleaned from the transcript of an
evidentiary hearing conducted in State court on May 22, 2001 by Judge Cirigliano who was appointed to
the case after the original trial judge was disqualified.  (See Doc. No. 35, Exhs. 293, 294).

2

(5:04 CV 0849)

The jury trial commenced on September 28, 2000 in the Summit County Court of Common

Pleas, with Judge Jane Bond presiding.  At the close of the prosecution's case, the trial judge

granted a motion for acquittal on the charge of kidnapping.  The defense called no witnesses and

the case went to the jury on October 27, 2000.

After the lunch break on Saturday, October 28, 2000, sometime around 2:00 p.m. and

while the jury was deliberating, the trial judge received a note from Juror No. 4.[2]  The trial judge

had a discussion with counsel, off the record, in chambers.  At 3:50 p.m., she convened

proceedings in court, on the record, as follows:

> THE COURT:  All right.  For purposes of the record, the jury is
> not present.  Court received from the bailiff the following note from the
> jury as follows:
>
> "There is a concern about a juror.  I was approached by a
> spokesperson for four other jurors.  From comments made by this juror
> these four jurors feel that he is agreeing with the group to expedite this
> process.  I was told by these jurors that they following comments were
> made." And that's verbatim.
>
> "No. 1, we need to get this done today.
>
> "No. 2, why are we even discussing this.  He has stated all along
> that he believes one thing but has all too quickly changed his vote to go
> along with the group.  This morning this juror stated to me that we need
> to finish this today as he will be leaving after today because he has a
> problem at home but he did not want to put us in that position.
>
> "To another juror he made the comment that he knows that Brad
> O'Born was innocent because he passed a polygraph test so Denny Ross
> had to be guilty.
>
> "I have been asked if this juror can be released so that he may
> attend to his affairs at home and we can have an impartial and fair jury."

---

[2]  During the evidentiary hearing later conducted by Judge Cirigliano, it developed that Juror No.
4 was the jury foreperson.  (Doc. No. 35, Exh. 293 at 70, 72).

(5:04 CV 0849)

           It's signed, "Juror No. 4."

(Doc. No. 35, Exh. 292 at 1264-65).[3]  What happened immediately following is of critical

importance and, therefore, the Court quotes here at great length from the trial transcript.

> [THE COURT]: Court, upon receiving this [note], summonsed the prosecution and the defense.  Court gave the prosecution and the defense an opportunity to consult.
>
> It's my understanding that the prosecution has consulted with the Prosecuting Attorney, Mr. Michael Callahan; is that correct, sir?
>
> MR. LoPRINZI [Assistant County Prosecuting Attorney]: That is correct, Your Honor.
>
> THE COURT: And it's my understanding that the defense has had an opportunity to consult with the defendant, Mr. Ross; is that correct, sir?
>
> MR. PANCER [Defense Counsel]: We have consulted with Mr. Ross, Your Honor.
>
> THE COURT: All right.  Court has reviewed the applicable law and references Ohio Revised Code 2945.36 and criteria thereunder for the discharge of a jury.  Court has shared certain concerns and views with counsel.  I'm going to give both the prosecution and the defense an opportunity to be heard.[4]

---

[3] "At trial the defense identified Brad O'Born as the boyfriend of the victim and as a possible suspect in her death.  No evidence was introduced at trial that O'Born had ever taken a polygraph exam." (Doc. No. 35, Exh. 229 at 2, n.1).

[4] Ohio Rev. Code § 2945.36 provides:

The trial court may discharge a jury without prejudice to the prosecution:
>    (A) For the sickness or corruption of a juror or other accident or calamity;
>    (B)  Because there is no probability of such jurors agreeing;
>    (C)  If it appears after the jury has been sworn that one of the jurors is a witness in the case;
>    (D)  By the consent of the prosecuting attorney and the defendant.

The reason for such discharge shall be entered on the journal.

4

(5:04 CV 0849)

I also am going to inquire of both the prosecution and the defense as to whether or not pursuant to Ohio Revised Code 2945.36, subsection D, either the prosecuting attorney or the defendant consent to the discharge of the jury without prejudice to the further prosecution of the case.

At this time I would inquire of the prosecution if you consent, on behalf of the prosecuting attorney, to the discharge of the jury without prejudice to the prosecution?

MR. LoPRINZI: Judge, I would consent to that, based on the information that we have about this juror and the note we received.  We believe in the defendant's right to a fair trial and we would consent, Judge.

THE COURT: Counsel.

MR. PANCER: Yes, to make the record we made in chambers, Your Honor, the first request --

THE COURT: All right.  First of all, have you had an opportunity to thoroughly discuss this matter with Mr. Ross?

MR. PANCER: Yes, Your Honor.

THE COURT: All right, sir.  You may proceed.

MR. PANCER: Our first request is that the Court rule on the defense motion that was filed earlier today concerning the misrepresentations made during closing argument because a ruling on that motion would certainly impact our decision on this request.  Given that if the jury is re-instructed as we requested, that that would be our first preference.  That is our first request, Your Honor.

THE COURT: All right, sir.  The Court finds that motion is not ripe, that the prosecuting attorney has not had a full or fair opportunity to respond to the motion made by the defense.  Court received a copy of that today.  To my knowledge I don't -- I assume that it's been served on the prosecutor since trial has not been in session.

But I know that I received no response from the prosecutor and I don't believe they've had a full and fair opportunity to so respond.

MR. PANCER: Okay.  We faxed that motion to them.  If they need time to respond, we wouldn't oppose that.  That's our request then,

5

(5:04 CV 0849)

that they be allowed a chance to read it and to respond.  They have not been filing responses, but that's our first request.

Your Honor is still denying that request?

THE COURT: Yes, sir.

MR. PANCER: The second request is that the jury be instructed to continue to deliberate, a verdict be rendered with the defense option of a mistrial if the decision were to be unfavorable.  The theory for that request is that the extra judicial evidence that exists in the jury room is not evidence that is favorable to the defense and hence we believe a verdict of not guilty would not be tainted as a -- as any other verdict would be, Your Honor.  That is our next request.

THE COURT: All right, sir.  The motion is denied.  I think that's fundamentally unfair to the State.

MR. PANCER: Our next request is a mistrial with prejudice.

THE COURT: And the basis for that?

MR. PANCER: The basis for that is the motions that we have previously filed in this case, the objections we made to various evidence at trial, the motion we have filed with this Court and all the grounds that might have given rise to a mistrial motion, Your Honor, including the question -- including the information contained in the taped statement of Denny Ross.

THE COURT: And so you're essentially renewing your previous motions for this Court?

MR. PANCER: Yes, in the context of this hearing.

THE COURT: All right, sir.  Motion is overruled.

MR. PANCER: Okay.  I talked to Mr. Ross.  He does not wish to have a mistrial in this case.  I've told him the different sections of the code that allow it in terms of the one under his consent.  He does not want it to be on that particular ground, Your Honor.

THE COURT: All right.  Mr. Ross, you understand and you've had an opportunity to discuss this matter with your lawyers?

THE DEFENDANT: Yes, I have, Your Honor.

6

(5:04 CV 0849)

THE COURT: Now, the law provides that you can consent to a discharge of this jury based upon what has been presented here in open court regarding the deliberations and what the Court believes to be the misconduct and corruption of at least one of the jurors in this trial.  Do you understand that you can consent to a mistrial for that basis?

THE DEFENDANT: I don't want a mistrial but I go along with whatever my attorney said.

THE COURT: Well, nobody wants a mistrial, sir.  I can speak on behalf of the State, I can certainly speak on behalf of this Court.  However, my concern based on this is that this evidence and these statements that have come from this jury are extremely damaging to the prospect that you could receive a fair trial, sir.

What this note is saying, Mr. Ross, is that at least one juror believes you're guilty based upon no evidence that was presented during this trial.  Do you understand that?

THE DEFENDANT: I understand, Your Honor.

THE COURT: And that he's made these representations to other jurors in that jury room and that he is refusing in good faith to negotiate with other jurors; that he is refusing in good faith to continue deliberations fully and fairly; he is indicating that he would leave at the end of today and that they must conclude this case today.  This is a refusal to fulfill the obligation of a juror.

Court also is concerned that his representations regarding evidence that he apparently believes based on this, evidence that was not presented during trial.

Court notes that prior to deliberations beginning the Court made inquiry of all members of the panel whether or not there was any reason that any member of this panel could not conclude their service and render a fair and impartial decision.  Court's opinion is that this juror had an absolute obligation to speak at that time, to advise the Court that he was of the opinion, whether based on fact or surmise, that Brad O'Born was innocent because he passed a polygraph test so that Denny Ross had to be guilty.

The Court is also of the opinion that that juror had the obligation to speak if he believed that he had pressing matters at home that require his attention and prevented him from fulfilling the obligation which was placed upon him in which he freely and willingly accepted.

7

(5:04 CV 0849)

        Court further finds that as a result of his representations to other jurors that he has impeded full and fair deliberation of the evidence in this case and that this Court is absolutely convinced that there's no way what the bell has struck I can unring.

        And his representations to other jurors regarding the guilt of Mr. Ross based upon this purported polygraph test I don't believe could be purged.  And I don't believe seating an alternate at this point in time could undo the damage that's been done to the deliberations in this case.

        And, no, Mr. Ross, none of us wants a mistrial.

        Based upon the communication from the juror, I have offered to both the prosecution and the defense the opportunity to voir dire either Juror No. 4 or to identify and voir dire the juror who purportedly has made these statements.  Do you wish that opportunity on behalf of the prosecution?

        MR. GREVEN [Assistant County Prosecuting Attorney]: No, Your Honor.  We are not in favor of voir dire during deliberations.

        THE COURT: On behalf of the defense?

        MR. PANCER: We have the same position.

        THE COURT: So you are not requesting that the Court voir dire any of the jurors regarding their potential for service in this case?

        MR. PANCER: Not at this time.

        THE COURT: This is the time, sir.  There is no other.

        MR. PANCER: No, no. We're not asking the Court to voir dire the jury.

        THE COURT:  All right.

        All right. Court, based upon its stated conclusions and based upon the face of the communication given by Juror No. 4, and since neither party wishes additional inquiry to be made by the Court in regard to a voir dire of any of the potential jurors, Court finds that the jury is unable to fulfill the obligations required by law, to fully and fairly consider the evidence and render a verdict based upon the evidence and the law in this case.

(5:04 CV 0849)

The Court finds that this situation is not the result of any action, inaction on behalf -- on the part of the prosecution, nor any action or inaction on the part of the defense.

Court finds there has been no misconduct by counsel.  Court finds that there has been no evidence of any misconduct or jury tampering outside the province of the 12 jurors themselves.

If there is anyone who has any information to the contrary they must speak now.

All right.  Hearing nothing this Court --

MR. CHESNOFF [Defense Counsel]: Your Honor, excuse me. We're not foreclosed from exploring this?  I mean, I know you said we don't have any information now, but that is not in any way --

THE COURT: Do you want to voir dire the jury, sir?

MR. CHESNOFF: Not during their deliberations I do not.  I think that would have a prejudicial impact on the deliberations.

THE COURT: I will permit inquiry of the jury after a decision has been made by the Court if the jury is discharged.  Certainly that will be done.

However, I want to make the record clear that I am giving the prosecution and the defense an opportunity to have this Court and to have them voir dire any individual jurors during deliberations in response to this.

MR. CHESNOFF: Thank you, Your Honor.  We appreciate that. We understand the distinction.

THE COURT: And you decline that?

MR. CHESNOFF: Yes.

THE COURT: And the prosecution has declined that?

MR. GREVEN: Yes.

THE COURT: What I'm inquiring here in open court is to whether anyone has any additional information that something has -- that there's been any jury tampering, that any information regarding this

2321e74e23a200a3

(5:04 CV 0849)

issue of Brad O'Born and a polygraph has been in any way submitted to
or conveyed to this juror -- this jury in any way.  Court has no factual
basis for believing that a polygraph of Mr. O'Born was ever conducted
or suggested.  There was nothing in the evidence to that, to submit
anything of that nature.

All right.  No one having come forth, the Court has -- based
upon the representations made, the Court finds pursuant to Ohio Revised
Code 2945.36 that there is corruption of a juror pursuant to subsection
A.[5]  Court finds that this jury cannot render a fair and impartial verdict
in accordance with the law.  The Court therefore discharges the jury
without prejudice to the prosecution.  A mistrial is declared.

Court will summons this panel and they will be discharged from
further attendance.

I will hear further in regard to this matter on Monday morning at
9:00, require the attendance of all at that time.

I will further allow inquiry to be made of this jury once they
have been discharged.  That will not be record inquiry, however.

(Doc. No. 35, Exh. 292 at 1265-77) (footnotes added).  The trial judge adjourned the proceedings

at 4:00 p.m. on October 28, 2000.  However, the oral declaration of a mistrial was not journalized

until November 2, 2000.

After declaring a mistrial from the bench and adjourning the proceedings, the trial judge

went briefly to her chambers and then proceeded to the jury room, unaccompanied by either

counsel or a court reporter.  There, she told the jury what she had done.  Five of the twelve jurors

availed themselves of the Judge's offer to talk to her individually and privately in chambers.  No

contemporaneous record was made of these conversations.  The remaining seven jurors waited in

the jury room and all twelve were later escorted from the building around 5:30 p.m.

---

[5] See n.4, supra.

10

(5:04 CV 0849)

It was during her private conversation with the second of the five jurors, and while all the jurors were still in the courthouse, that the trial judge learned that, sometime before their lunch break <u>and</u> before the question relating to juror misconduct had been written, the jury had already signed verdicts of "not guilty" on three of the charges: aggravated murder, murder, and rape.[6]  At the trial judge's direction, these verdicts were collected by the bailiff from the jury room; but the trial judge did not immediately tell the lawyers about the existence of the signed verdict forms. The trial judge did not announce the mistrial on the record in the presence of the jury.  Nor did she assemble the jury in the courtroom and officially excuse or discharge them prior to when they were escorted from the building around 5:30 p.m. on October 28, 2000.

While the trial judge was speaking with the jurors, one of the defense counsel went to her chambers to speak with her, but was told by her bailiff that the jurors wished to talk privately with the trial judge and that counsel would have to wait.  In sequence, the trial judge spoke first to the five jurors, then to a reporter from the Akron *Beacon Journal*, and then with counsel in chambers.  Only then did she inform counsel that the jury had "reached verdicts, if you want to call them that."  (Doc. No. 35, Exh. 188 at 10, ¶ 20).  By this time, the jurors had all left the building.  Hours later, defense counsel learned from a juror that three unanimous "not guilty" verdict forms had been signed by the jury.  (<u>Id</u>.).

The trial judge re-commenced proceedings on Monday, October 30, 2000, and set a new trial date of January 8, 2001.  Petitioner later filed a motion to bar retrial on the grounds of

---

[6]  Copies of these verdict forms, signed by all twelve jurors, are attached to an affidavit filed by defense counsel in support of the request made in State court to disqualify the trial judge.  <u>See</u> Doc. No. 35, Exh. 188, Exh. C.

(5:04 CV 0849)

double jeopardy.  He also moved to disqualify the trial judge on the ground that she would

undoubtedly become a witness during subsequent proceedings.  On January 17, 2001, the Ohio

Supreme Court disqualified the trial judge and returned the matter to the administrative judge of

the Common Pleas Court for reassignment.  Visiting Judge Joseph Cirigliano was assigned the

case.

Judge Cirigliano granted Petitioner's motion for an evidentiary hearing.  That hearing was

conducted on May 22, 2001.  Based on the evidence presented, the motion to bar retrial was

granted by Judge Cirigliano in an opinion filed on February 15, 2002.[7]  He stated:

> At the time that the trial judge declared a mistrial in this case, the judge had
> failed to scrupulously consider and investigate the alternatives to a mistrial.  The trial
> judge had no first-hand knowledge on which to base its conclusion that the jury was
> tainted and incapable of completing its deliberations.  Relying solely on the information
> contained in the jury foreperson's note, the trial judge possessed second and third-hand
> knowledge that one problem juror existed; that the juror had communicated the O'Born
> polygraph information to one other juror, who in turn communicated that information to
> the foreperson; that the same problem juror had communicated to four jurors that he had
> personal matters to attend to and needed to "get this [deliberation] done today;" and that
> the foreperson believed that the jurors could continue to deliberate as "an impartial and
> fair jury."  The foreperson requested that the problem juror be "released."  The trial court
> failed to make any inquiry of the jurors as to the information contained in the
> foreperson's note and failed to provide the jury with any curative instructions.  Based on
> the information known to the trial judge at the time she declared a mistrial, it was not
> possible to know if the jury was tainted and if it was tainted, whether that taint was

---

[7]  In his opinion granting the motion to bar re-trial, Judge Cirigliano cited Supreme Court
opinions as authority.  He also pointed out that

> [t]he Ohio Supreme Court has applied the following criteria in determining whether a
> trial judge properly exercised his or her discretion in declaring a *sua sponte* mistrial: (1)
> did "manifest necessity" or a high degree of necessity exist for ordering a mistrial; (2)
> did reasonable alternatives to declaring a mistrial exist; and (3) is the public interest in
> fair trial designed to end in just judgments best served by ordering a mistrial?"

(Doc. No. 35, Exh. 229 at 11, citing State v. Widnar, 68 Ohio St.2d 188, 190 (1981); State v. Schmidt, 65
Ohio App.2d 239, 244-45 (Ohio. App. 1979)).

12

(5:04 CV 0849)

material and incurable.  The trial judge failed to adequately consider alternatives such as dismissing the problem juror, seating an alternate, providing curative instructions, and permitting the deliberations to continue.

The trial court acted precipitately in declaring the mistrial.  The issue of the problem juror arose late on a Saturday afternoon.  Rather than declare a mistrial at that time, the court could have excused the jury for the night to permit the court additional time to consider the problem and possible alternatives.  Instead, the court foreclosed any further exploration of the matter.  The court did not discuss with counsel the procedure for an inquiry of the jury after discharge, which it had stated to counsel it would discuss with them before the jury was discharged.  The court did not summons the jurors into open court in order to discharge them.  Instead, the jurors were discharged in the jury room outside the presence of counsel, courtroom personnel, or a court reporter.  "A precipitate decision, reflected by a rapid sequence of events culminating in a declaration of mistrial, would tend to indicated [sic] insufficient concern for the defendant's constitutional protection."  Brady v. Samaha, 667 F.2d 224, 229 (1st Cir. 1981); cited in United States v. Dixon, 913 F.2d 1305, 1311 (1990).

In the present case there existed no manifest necessity for declaring a mistrial.  Reasonable alternatives to a mistrial existed and the public interest in fair trials designed to end in just judgments was not met by the trial court's declaration of a mistrial.  The trial court abused its discretion in declaring a mistrial because it failed to investigate the information set forth in the jury note, it failed to explore alternatives to declaring a mistrial, it failed to take into consideration the verdicts that had been reached by the jury, it failed to ascertain whether any prejudice existed as a result of the information related in the foreperson's note, it failed to attempt to cure any taint which may have existed, it acted precipitately in the declaration of a mistrial, and it failed to duly consider the defendant's right to have his trial completed by a particular tribunal, especially in light of the fact that this is a capital case.  See United States v. Perez, 22 U.s. (9 Wheat) 579, 580 (1824).

For the reasons stated herein, Defendant Ross' motion to bar retrial on double jeopardy grounds in granted.  In view of this Court's order upholding the defendant's double jeopardy claims, this Court declines to rule on any of the other motions presently pending before this Court.

(Doc. No. 35, Exh. 229, at 14-16).

The State appealed and, in a 2-1 decision filed December 31, 2002, Judge Cirigliano's

decision was reversed and remanded by a panel of the Ninth Judicial District Court of Appeals of

Ohio.  That court "confine[d] its review to the record of October 28, 2000" (Doc. No. 35, Exh.

241 at 8), even though it acknowledged that it was "difficult to ignore . . . the three 'not guilty'

13

(5:04 CV 0849)

verdict forms[.]"  (Id.).  Applying an abuse of discretion standard to the trial judge's mistrial

ruling (see id. at 10) and a *de novo* standard to Judge Cirigliano's decision to bar retrial on

double jeopardy grounds (see id. at 11), the Ohio court of appeals concluded that "the visiting

judge committed reversible error in finding that there was no manifest necessity for a mistrial."

(Id.).  Purposefully ignoring many of the facts that came out at the evidentiary hearing conducted

by Judge Cirigliano, the court of appeals stated:

> Although the visiting judge concluded that the original trial judge had rushed to
> judgment without thoroughly considering the alternatives available, that conclusion was
> not supported by the record of what transpired on October 28, 2000.[4]  Prior to declaring a
> mistrial, the original trial judge asked the parties to state their positions on this issue and
> discussed with them each of the proposed alternatives to declaring a mistrial.

> > [4] The primary emphasis of Ross's arguments and the visiting judge's
> > opinion was on information that was discovered after the mistrial was declared.
> > This Court does not comment upon any of that information.  As this Court has
> > already emphasized, it confines its review to the record prepared at the time the
> > decision was made.

> * * *
> As the original trial judge explained on the record, she felt that she had no other
> alternative but to declare a mistrial.  This Court finds no abuse of discretion in that
> determination.  The visiting judge, based on an incorrect legal standard, erred in finding
> that there was no manifest necessity for a mistrial.  . . .

(Doc. No. 35, Exh. 241 at 16, 23, footnote in original).  Judge P. Baird, in dissent, noted that he

"agree[d] with very little, if any, of the thrust of today's majority opinion[,]" (id. at 26), and

concluded:

> . . .in the absence in the record of any exploration of other alternatives[,] [t]he only thing
> the court had was the note itself, the wording of which is a slim reed upon which to base
> the denial to the defendant of a right guaranteed to him by both the Ohio and United
> States Constitutions.  A court has no right to take away such a right unless the record
> amply supports the necessity for such action, and it is up to the trial court to create such a
> record, whether anybody asks for it or not.

14

(5:04 CV 0849)

(Id. at 27).  Ross appealed to the Ohio Supreme Court, which, on May 7, 2003, declined to hear

the appeal.  (Doc. No. 35, Exh. 315).[8]

  This petition followed on May 6, 2004,[9] challenging the ruling of the Ohio court of

appeals as being both contrary to, and an unreasonable application of, clearly established federal

law as determined by the Supreme Court of the United States and as resulting in a decision based

upon an unreasonable determination of the facts in light of the evidence presented in State court.

(Doc. No. 1, ¶ 3).  See also, 28 U.S.C. § 2254(d)(1), (2).


### III.  DISCUSSION

**A.  Introduction**

  **1.  Applicable Law**

  As ably pointed out by the Magistrate Judge, this Court's role when reviewing a petition

for habeas corpus under 28 U.S.C. § 2254 is narrowly defined.

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas
> court to grant a state prisoner's application for a writ of habeas corpus with respect to
> claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue
> only if one of the following two conditions is satisfied -- the state-court adjudication
> resulted in a decision that (1) "was contrary to ... clearly established Federal law, as
> determined by the Supreme Court of the United States," or (2) "involved an unreasonable
> application of ... clearly established Federal law, as determined by the Supreme Court of

---

 [8]  On September 10, 2003, the trial court denied Ross's motion to perfect the three verdicts.  It also denied a Rule 29 motion for acquittal and set a new trial date of November 17, 2003.  On reconsideration of the Rule 29 motion, the court acquitted Ross on the charge of rape only.  That has been appealed, but is not the subject of this habeas petition.

 [9]  The petition was automatically referred to the Magistrate Judge (Doc. No. 6).  Thereafter, the Magistrate Judge dealt with close to thirty (30) motions prior to issuing his Report and Recommended Decision on May 3, 2005.

(5:04 CV 0849)

the United States."  Under the "contrary to" clause, a federal habeas court may grant the
writ if the state court arrives at a conclusion opposite to that reached by this Court on a
question of law or if the state court decides a case differently than this Court has on a set
of materially indistinguishable facts.  Under the "unreasonable application" clause, a
federal habeas court may grant the writ if the state court identifies the correct governing
legal principle from this Court's decisions but unreasonably applies that principle to the
facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2002).[10]

The "contrary to" and "unreasonable application" clauses of § 2254 have independent

meaning.  Id. at 405.

[A] state-court decision can be "contrary to" this Court's clearly established
precedent in two ways.  First, a state-court decision is contrary to this Court's precedent
if the state court arrives at a conclusion opposite to that reached by this Court on a
question of law.  Second, a state-court decision is also contrary to this Court's precedent
if the state court confronts facts that are materially indistinguishable from a relevant
Supreme Court precedent and arrives at a result opposite to ours. (citation omitted).

The word "contrary" is commonly understood to mean "diametrically different,"
"opposite in character or nature," or "mutually opposed."  Webster's Third New
International Dictionary 495 (1976).  The text of § 2254(d)(1) therefore suggests that the
state court's decision must be substantially different from the relevant precedent of this
Court.  ...  A state-court decision will certainly be contrary to our clearly established
precedent if the state court applies a rule that contradicts the governing law set forth in
our cases.  ...  A state-court decision will also be contrary to this Court's clearly
established precedent if the state court confronts a set of facts that are materially
indistinguishable from a decision of this Court and nevertheless arrives at a result
different from our precedent.  Accordingly, in either of these two scenarios, a federal
court will be unconstrained by § 2254(d)(1) because the state-court decision falls within
that provision's "contrary to" clause.

Williams, 529 U.S. at 405-06.[11]

_____

[10]  The "new constraint(s)" referred to by the Court were enacted by the Antiterrorism and
Effective Death Penalty Act of 1996 ("AEDPA").

[11]  The Supreme Court cited as an example of a decision that is "substantially different from the
relevant precedent of [the] Court," the case where a state court would apply an incorrect burden of proof.
The Court stated:

(continued...)

16

(5:04 CV 0849)

"[A] state-court decision involves an unreasonable application of [the Supreme] Court's precedent if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407.  The Court stressed, however, that: "For purposes of today's opinion, the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410 (emphases in original).[12]

---

[11] (...continued)
... Take, for example, our decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in Strickland that the prisoner need only demonstrate a "reasonable probability ... the result of the proceeding would have been different." Id., at 694, 104 S.Ct. 2052.

Williams, 529 U.S. at 405-06.  The Court also noted a similar example where, although the result might have been contrary to what the federal court would do, the analysis of the state court was not "contrary to" precedent within the meaning of § 2254.  The Court stated:

Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies Strickland as the controlling legal authority and, applying that framework, rejects the prisoner's claim.  Quite clearly, the state-court decision would be in accord with our decision in Strickland as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the Strickland framework itself.  It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to Strickland, our clearly established precedent.  Although the state-court decision may be contrary to the federal court's conception of how Strickland ought to be applied in that particular case, the decision is not "mutually opposed" to Strickland itself.

Id. at 406.

[12] The Court drew a further distinction.  It noted that " 'federal courts, even on habeas, have an (continued...)

17

(5:04 CV 0849)

### 2.  This Court's Task

Under Fed. R. Civ. P. 72, this Court reviews *de novo* only those issues in the R&R to which written objections have been made.

In his original petition (Doc. No. 1), Petitioner raised several grounds for relief; he later added an additional ground in his amended petition (Doc. No. 57).  The chart contained in Appendix A lists each ground and the Magistrate Judge's recommendation on each ground and shows which party has filed objections with respect to each recommendation.

### B.  *De Novo* Analysis of Objections to the R&R

The Court will address the Respondent's objections first, since they go to the very heart of the case.  Thereafter, the Court will address the Petitioner's objections.

### 1.  Respondent's Objections (Doc. No. 61)

Respondent's objections go directly to the ultimate recommendation of the Magistrate Judge, namely, that retrial of the Petitioner would violate the protections of the Double Jeopardy Clause and that the habeas corpus petition should therefore be granted.  Petitioner has filed no response to these objections.

---

[12]  (...continued)
independent obligation to say what the law is.' "  Williams, 529 U.S. at 411 (quoting  Wright v. West, 505 U.S. 277, 305 (1992) (O'Connor, J., concurring).  Therefore, a habeas court has no obligation to let stand a state court's incorrect legal determination merely because it may be reasonable.

18

(5:04 CV 0849)

Respondent's objections generally address the recommendations regarding the following

three grounds:

> ***Ground A.iv*** :  The Ninth Appellate District acted contrary to
> clearly established federal law in adjudicating Petitioner's double
> jeopardy claim by absolving the prosecution of its burden to
> demonstrate manifest necessity for a mistrial declared over the
> objection of the defendant.
>
> ***Ground A.v*** :  The Ninth Appellate District acted contrary to
> clearly established federal law by absolving the trial judge of her
> duty to exercise sound discretion in declaring a mistrial.
>
> ***Ground C*** :  To the extent, if any, that the Ninth Appellate District
> successfully articulated the correct rules of clearly established
> federal law regarding the double jeopardy protections of the
> Federal Constitution, the Ninth Appellate District's application of
> federal law was objectively unreasonable within the meaning of
> *Williams v. Taylor*, 529 U.S. 362 (2000).

Respondent also raises an issue which the Magistrate Judge did not address, although it

was raised in the Return of Writ, namely that Ross has not satisfied the two requirements set

forth in Harpster v. Ohio, 128 F.3d 322 (6th Cir. 1997), cert. denied, 522 U.S. 1112 (1998).

### a.  Determination of "manifest necessity"

In Ground A.iv and Ground A.v, Petitioner asserted that the Ohio appellate court acted

contrary to clearly established federal law in adjudicating Petitioner's double jeopardy claim "by

absolving the prosecution of its burden to demonstrate manifest necessity for a mistrial declared

over the objection of the defendant[ ]" and "by absolving the trial judge of her duty to exercise

sound discretion in declaring a mistrial."  The Magistrate Judge concluded that the state court of

appeals "failed to require the prosecution to demonstrate how the trial judge's decision to grant

the mistrial was the product of manifest necessity."  (R&R at 42).  See Arizona v. Washington,

(5:04 CV 0849)

434 U.S. 497, 505 (1978) ("the prosecutor must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant").

In addition, Petitioner asserted in Ground C that, to whatever extent the Ohio appellate court may have <u>articulated</u> the correct rules of clearly established federal law regarding double jeopardy protections, its <u>application</u> of that law was objectively unreasonable.  The Magistrate Judge concluded that it was unreasonable for the Ohio court of appeals to assume that the trial judge "was foreclosed from giving fuller consideration to her mistrial decision in light of the facts which were discovered after her ruling from the bench."  (R&R at 60).  In particular, the Magistrate Judge concluded that, "once the [trial] court discovered that the jury had reached verdicts, as it emerged, on the three most serious felony counts[,] [r]easonable minds could conceive of several sensible alternatives[,] [but] denying any consideration whatsoever to this relevant information is not among [those reasonable alternatives]."  (R&R at 61).  The Magistrate Judge ultimately concluded that "the decision of the Ohio Court of Appeals on this issue involved an unreasonable application of clearly established Federal law."  (R&R at 65).

The Respondent attacks on several fronts the recommendation of the Magistrate Judge with respect to the issue of "manifest necessity."  Respondent asserts that the Magistrate Judge recommends granting the writ "largely because he would have chosen another set of alternatives than the state trial and appellate judges."  (Resp. Obj. at 5).  The Respondent states that this recommendation is made despite the fact that the Magistrate Judge cited the proper standard for habeas review, i.e., that "[a] state court decision is not unreasonable simply because the federal court considers the state decision to be erroneous or incorrect[,] . . . [but only if the state court's

20

(5:04 CV 0849)

decision] is an objectively unreasonable application of federal law."  <u>Williams v. Taylor</u>, 529

U.S. 362, 412-13 (2002).

**1)  Protecting the ends of public justice**

Respondent first challenges the Magistrate Judge's reliance on <u>United States v. Jorn</u>, 400

U.S. 470 (1971), wherein a plurality of the Court held:

> . . . When one examines the circumstances surrounding the discharge of this jury,
> it seems abundantly apparent that the trial judge made no effort to exercise a
> sound discretion to assure that, taking all the circumstances into account, there
> was a manifest necessity for the *sua sponte* declaration of this mistrial.

400 U.S. at 487.  Earlier in the <u>Jorn</u> opinion, the Supreme Court stated that the "doctrine of

manifest necessity stands as a command to trial judges not to foreclose the defendant's option

until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public

justice would not be served by a continuation of the proceedings."  400 U.S. at 485.

Respondent asserts that the principle underlying the <u>Jorn</u> holding was that the trial court,

in its sound discretion, must balance defendant's double jeopardy rights against defeating the

ends of public justice.  Respondent argues that the Magistrate Judge "calibrated his analysis

almost entirely in favor of the defendant and largely sidestepped the serious ends of public justice

concerns raised by this case."  (Resp. Obj. at 7).  Respondent argues that, "[b]y exercising its

power to prevent the ends of public justice from being defeated, the state appeals court

reasonably applied federal law[.]"  (Resp. Obj. at 12).

While this Court does not quarrel with Respondent's <u>legal</u> arguments as far as they go, it

concludes that the arguments conveniently ignore the <u>factual</u> scenario of <u>this</u> case and attempt to

apply the law in a vacuum -- which is also what the Ohio court of appeals did.

21

(5:04 CV 0849)

The Magistrate Judge concluded that "[u]nder the totality of the circumstances of this case the court's conduct fell short of the 'scrupulous exercise of judicial discretion' which the Supreme Court requires in a mistrial situation of this sort."  (R&R at 65, citing <u>Jorn</u>, 400 U.S. at 485).  In the Magistrate Judge's view, a very important component of that "totality of the circumstances" was the discovery of three signed verdict forms after an oral declaration of mistrial.  The R&R states: "Once the judge learned of the signed verdict forms, a proper consideration of the defendant's double jeopardy interests mandated a reconsideration of her initial mistrial ruling."  (R&R at 63).

Although not completely disregarding the discovery of the verdict forms, as did the Ohio court of appeals, this Court would not place on that discovery quite the same emphasis as did the Magistrate Judge.  In the Court's view, even if the verdicts had never been discovered, even if the verdicts did not exist, the record would still reveal the trial judge's utter failure to exercise the required "scrupulous . . . judicial discretion" in the face of the jury foreperson's question prior to the oral mistrial declaration.

As properly noted by Judge Cirigliano following the evidentiary hearing:

<u>At the time that the trial judge declared a mistrial in this case</u>, the judge had failed to scrupulously consider and investigate the alternatives to a mistrial.  The trial judge <u>had no first-hand knowledge</u> on which to base its conclusion that the jury was tainted and incapable of completing its deliberations.  Relying solely on the information contained in the jury foreperson's note, the trial judge <u>possessed second and third-hand knowledge</u> that one problem juror existed; that the juror had communicated the O'Born polygraph information to one other juror, who in turn communicated that information to the foreperson; that the same problem juror had communicated to four jurors that he had personal matters to attend to and needed to "get this [deliberation] done today;" and that the foreperson believed that the jurors could continue to deliberate as "an impartial and fair jury."  The foreperson requested that the problem juror be "released."  The trial court <u>failed to make any inquiry of the jurors as to the information contained in the foreperson's note and failed to provide the jury with any curative instructions</u>.  Based on

22

(5:04 CV 0849)

> the information known to the trial judge at the time she declared a mistrial, <u>it was not possible to know if the jury was tainted and if it was tainted, whether that taint was material and incurable.  The trial judge failed to adequately consider alternatives such as dismissing the problem juror, seating an alternate, providing curative instructions, and permitting the deliberations to continue.</u>

(Doc. No. 35, Exh. 229 at 14, underlining added).

These are the <u>facts</u>, properly found by Judge Cirigliano in his role as post-mistrial fact-finder.  No one could seriously challenge these facts.  Yet the Ohio court of appeals simply declared, without any citation to the record, that "[p]rior to declaring a mistrial, the original trial judge asked the parties to state their positions on the issue and discussed with them each of the proposed alternatives to declaring a mistrial." (Doc. No. 35, Exh. 241 at 16).  This is absolutely not the case, as is shown by the very lengthy quotation from the record in Section II, <u>supra</u>.

It is quite clear from the record of the trial <u>at the time of the mistrial decision</u> (the time period focused on by the Ohio court of appeals) that the trial judge had made no effort to ascertain the truth of what was contained in the foreperson's note.  The Ohio court of appeals discounted that fact by declaring that notes from the jury are taken at face value.  That might be true to a point, but not when the note is going to be used as the basis for a mistrial over the defendant's objection in a capital murder case.

Further, even <u>assuming</u> the truth of the information contained in the note, the trial judge made no effort to determine whether that extra-judicial information had indeed resulted in "corruption of a juror," Ohio Rev. Code § 2945.36(A), which would justify discharge of the jury under Ohio law.  The trial judge had informal discussions with counsel in chambers, but she never inquired of the jurors themselves.  At the evidentiary hearing, she said that she did not *voir*

23

(5:04 CV 0849)

*dire* the jury because neither counsel wanted her to do so; however, as the presiding judge, she

had a duty to make proper inquiry.

     The Ohio court of appeals criticized Judge Cirigliano for a "hindsight analysis of the

thought processes of the trial judge and <u>information that was not before the trial judge</u> at the time

she made her decision[ ]" (Doc. No. 35, Exh. 241 at 5, underlining added),[13] ignoring the fact that

the information was not before the trial judge only because she herself failed to seek the

information in a timely fashion.  The Ohio court of appeals concluded, in the face of all the facts

set forth by Judge Cirigliano but rejected by the court as hindsight analysis, that the trial judge

had properly exercised her discretion in declaring manifest necessity for a mistrial.  This is

clearly both an unreasonable application of the law and an unreasonable determination of the

facts.  There is no way that any reasonable person would conclude that the trial judge had

employed a "scrupulous" exercise of judicial discretion to determine that a mistrial was a

"manifest necessity."

     The mere fact that the jury foreperson wrote a note containing certain statements or

allegations does not render a mistrial "manifest."[14] The trial judge has a duty to explore the truth

of the information in the note and the impact, if any, of that information on a jury's ability to

deliberate.  That simply did not happen here.

_____

[13]  The Ohio court of appeals furthered criticized Judge Cirigliano for "view[ing] his role as that of an appellate judge[,]" and stated that his only role "was to determine whether there had been a manifest necessity to declare a mistrial[.]"  (<u>Id</u>., n.5).  Of course, that is precisely what Judge Cirigliano had done.

[14]  When something is "manifest" it is "clearly revealed to the eye, mind, or judgment; open to view or comprehension; obvious."  OXFORD ENGLISH DICTIONARY.

(5:04 CV 0849)

Furthermore, although this Court does not find discovery of the three verdict forms

dispositive, it does at least recognize that such discovery changed the circumstances faced by the

trial judge and should not have been ignored.[15]  Here, the trial judge made no effort to evaluate

the potential validity of those verdicts by inquiring of the individual jurors on the record whether

those verdicts might have been tainted by either the one juror's knowledge of a lie detector test

and/or that same juror's desire to complete deliberations that day; she never revealed to the

parties and counsel even the existence of verdicts prior to the jury's release (which she never did

formally in open court).

This Court concludes that the State court of appeals, in deciding that Petitioner can be

retried without violating the Double Jeopardy Clause of the Fifth Amendment, rendered a

decision that "involved an unreasonable application of[ ] clearly established federal law," 28

U.S.C. § 2254(d)(1),  which requires a showing of "manifest necessity" before declaring a

mistrial over a defendant's objection.  Here, there was no such showing.

## 2)  Improper application of State law

The Respondent also argues that the Magistrate Judge improperly hinged his

recommendation that federal law was unreasonably applied upon an incorrect reading of State

law as it relates to the finality and/or journalization of verdicts.  The Magistrate Judge concluded

that the oral mistrial order was not a bar to reconsideration, once the signed verdicts were

discovered, because the oral order had not yet been journalized and " '[a] court of record speaks

_____

[15]  As pointed out by the Magistrate Judge:  "Reasonable minds could conceive of several
sensible alternatives; denying any consideration whatsoever to this relevant information is not among
them.  (R&R at 61, emphasis added).

(5:04 CV 0849)

only through its journal and not by oral pronouncement.' "  (R&R at 55, 57).  Respondent argues

that the Ohio court of appeals recognized and upheld as final the oral declaration of a  mistrial.

Respondent states that it has reviewed all of the cases cited by the Magistrate Judge and none

stands for the "erroneous conclusion that a declaration of mistrial does not actually occur with a

judge's oral pronouncement -- despite the conclusion of a trial and the discharge of a jury from

its service and oath -- until a judge files a journal entry."  (Resp. Obj. at 20).[16]

For one simple reason, this Court need not decide whether, under Ohio law,

journalization is required to make a ruling final -- even if the oral mistrial declaration from the

bench was final, it still violated clearly established federal law because it simply was not the

product of the "scrupulous exercise of judicial discretion" upon a showing by the prosecution of

"manifest necessity" for a mistrial over defendant's objection.

### 3)  Appeals Court decision deemed erroneous and incorrect

The Respondent argues that the Magistrate Judge improperly determined that the writ

should be granted because the Ohio appeals court decision is incorrect.  This argument has no

merit in light of the discussion above and the objection is overruled.

### 4)  Conclusion re: Manifest Necessity

The Court overrules Respondent's objections and adopts the Magistrate Judge's

conclusion that Ohio courts fell short of the "scrupulous exercise of judicial discretion" which

---

[16]  The Respondent improperly characterizes the facts of the case when it argues that the trial judge made an oral declaration of mistrial <u>and</u> concluded the trial and dismissed the jury.  That is not what happened.  No one can honestly say that the trial judge ever properly discharged the jury.

(5:04 CV 0849)

the Supreme Court requires in a mistrial situation of this sort and, therefore, resulted in a

decision that was an unreasonable application of clearly established federal law.

### b.  The *Harpster* exception

Respondent argues that the Magistrate Judge failed to address its argument in the Return

of Writ (Doc. No. 33) that the narrow circumstances under which a federal court may interfere

with a state court proceeding have not been met in this case.  Respondent points to Harpster v.

Ohio, 128 F.3d 322, 326 (6th Cir. 1997), cert. denied, 522 U.S. 1112 (1998).  See Doc. No. 33 at

17-18; Resp. Obj. at 28-30.  Although the Magistrate Judge cited to Harpster several times in his

R&R, it does appear that he has not addressed this issue directly.

The Court is not entirely sure that it understands Respondent's Harpster argument.  In the

Return of Writ, the Respondent purports to quote from Harpster as follows:

> As this court has explained, the federal adjudication of double jeopardy claims
> raised on pre-trial petitions for habeas corpus is appropriate when those claims
> have been raised and rejected in the state trial court and under state law there is no
> right to interlocutory appeal.  See Gully v. Kunzman, 592 F.2d 283, 287 (6th
> Cir.1979), cert. denied, 442 U.S. 924, 99 S.Ct. 2850, 61 L.Ed.2d 292, reh'g
> denied, 444 U.S. 889, 100 S.Ct. 192, 62 L.Ed.2d 125.  **Ross** satisfies these
> requirements.  First, the trial court considered and rejected **Rosss** [sic] pre-trial
> motion to dismiss the second trial based on a violation of the Double Jeopardy
> Clause.  Second, under Ohio law, "the overruling of a motion to dismiss on the
> ground of double jeopardy is not a final appealable order."  State v. Crago, 53
> Ohio St.3d 243, 244, 559 N.E.2d 1353 (1990).  Under these circumstances federal
> adjudication was necessary to protect **Ross'** rights under the Double Jeopardy
> Clause.

Return of Writ, at 17-18 (bolding added) (purporting to quote from Harpster, 128 F.3d at 325-

26).  The original Harpster opinion, of course, did not have any references to Ross!  All of the

uses of "Ross" in the above quotation are completely fabricated.  The original Harpster decision

27

(5:04 CV 0849)

refers to "petitioner" in each instance where "Ross" is used above.  In the Respondent's objections to the R&R, the same passage above is quoted, but correctly -- using "petitioner" and not "Ross."  As already noted, the Court has no idea what the Respondent is really attempting to argue here.  It is not surprising that the Magistrate Judge ignored this contradictory offering of the Respondent.

The clearest expression of Respondent's argument on this point is that Petitioner cannot bring this habeas petition because he "has already received state appellate review of his double jeopardy claim."  This Court reads Harpster as stating just the opposite, namely, that precisely because his double jeopardy claim has already been rejected by the State courts, "federal adjudication [is] necessary to protect petitioner's rights under the Double Jeopardy Clause." Harpster, 128 F.3d at 326.  Harpster stands in part for the unremarkable proposition that a federal court cannot review double jeopardy claims that have not first been presented to the state court. This is a standard exhaustion requirement for all habeas petitions.  In fact, in making this legal point, the Harpster court cites to Gully v. Kunzman, 592 F.2d 283, 287 (6th Cir. 1979), cert. denied, 442 U.S. 924; reh'g denied, 444 U.S. 889 (1979), which states: "Of course, a federal court should not entertain double jeopardy claims on pre-trial habeas corpus unless the defendant has exhausted whatever procedures are available to him under state law for 'pre-exposure' vindication of his rights."

Upon de novo review of Respondent's Harpster argument, this Court finds no merit in any objection based on Harpster and therefore overrules any such objection.

28

(5:04 CV 0849)

### 2.  Petitioner's Objections (Doc. No. 60)

Of course, Petitioner has no objection to the overall recommendation that habeas relief be granted on double jeopardy grounds.  Petitioner's objections are all aimed at preserving his legal arguments for purposes of appeal.  Respondent has filed a brief responding to Petitioner's objections.  (Doc. No. 62).  The following is the Court's *de novo* review on these matters.

### a.  Prosecution following acquittal

> ***Ground A.i*** : The Ninth Appellate District acted contrary to clearly established federal law by holding that Petitioner could be prosecuted a second time following an acquittal;  and

> ***Supplemental Ground*** :  Re-prosecution of Petitioner will violate his rights against double jeopardy guaranteed by the Fourteenth Amendment because Ohio refuses to acknowledge that Petitioner has been lawfully acquitted.

Petitioner objects to the Magistrate Judge's conclusion that the Ohio court of appeals did not hold that he could be re-prosecuted following an acquittal.  This objection must be considered along with another objection, namely, Petitioner's objection to the Magistrate Judge's conclusion with respect to his supplemental ground relating to the Ohio court's "refus[al] to acknowledge that [he] has been lawfully acquitted." (R&R at 26-27, 69-73; Pet. Obj. at 2-3).  Upon *de novo* review, this Court cannot fault the reasoning of the R&R with respect to these two grounds.  Accordingly, these two objections are overruled and the Court adopts the Magistrate Judge's recommendations on these two grounds.  See R&R at 26-27; 69-73.

29

(5:04 CV 0849)

### b.  Arbitrary decision in violation of *Rogers v. Tennessee*, 532 U.S. 451 (2001)

> *Ground A.ii* :  The Ninth Appellate District acted contrary to
> clearly established federal law by rendering an arbitrary decision in
> violation of *Rogers v. Tennessee*, 532 U.S. 451 (2001).

Petitioner objects to the Magistrate Judge's conclusion that his claim under Rogers v.
Tennessee, 532 U.S. 451 (2001) is no more than a claimed violation of state law and, as such, is
not cognizable under habeas review and that, in any event, Rogers is inapposite because it
involved a direct appeal.  (R&R at 65-67; Pet. Obj. at 6-8).

Applying Rogers to this case would be a stretch.[17]  Petitioner advances Rogers as support
for his claim that "refusal of the Ohio Court of Appeals to consider the evidence adduced at
Petitioner's evidentiary hearing constituted a blatantly arbitrary decision in light of Ohio
precedent."  (Pet. Obj. at 6).  In a way, he is attempting to argue "surprise" and that Ohio
precedent clearly allowed him an evidentiary hearing.  Upon *de novo* review, this Court agrees

---

[17]  The Supreme Court described the Rogers case as follows:

> This case concerns the constitutionality of the retroactive application of a
> judicial decision abolishing the common law 'year and a day rule.'  At common law, the
> year and a day rule provided that no defendant could be convicted of murder unless his
> victim had died by the defendant's act within a year and a day of the act.  See, e.g.,
> Louisville, E. & St. L.R. Co. v. Clarke, 152 U.S. 230, 239, 14 S.Ct. 579, 38 L.Ed. 422
> (1894); 4 W. Blackstone, Commentaries on the Laws of England 197-198 (1769).  The
> Supreme Court of Tennessee abolished the rule as it had existed at common law in
> Tennessee and applied its decision to petitioner to uphold his conviction. The question
> before us is whether, in doing so, the court denied petitioner due process of law in
> violation of the Fourteenth Amendment.

Rogers, 532 U.S. at 453.  Rogers had been convicted of the murder of a victim who died 15 months after
he had been stabbed.  Although Rogers was claiming a due process violation, the underlying issue was
one of retroactive application of new case law to his circumstances.  As already noted, it is simply too
much of a stretch to apply Rogers here.

30

(5:04 CV 0849)

that this ground raises only state law arguments and is not cognizable in habeas corpus.  This

objection is overruled and the Court adopts the R&R with respect to this ground.  See R&R at

65-67.

### c.  No right to an evidentiary hearing

> ***Ground A.iii*** :  The Ninth Appellate District acted contrary to
> clearly established federal law by holding that Petitioner did not
> have a right under the Federal Constitution to a pretrial evidentiary
> hearing in support of his double jeopardy claim.

Petitioner objects to the Magistrate Judge's conclusion that the Ohio court of appeals did

not hold that Petitioner was not entitled to an evidentiary hearing in support of his double

jeopardy claim, but only that it had limited its evaluation of the mistrial decision to matters that

were on the record at the time the decision was made.  (R&R at 27; Pet. Obj. at 3-4).

The Court finds some merit in Petitioner's argument that, by refusing to consider matters

which only came to light by way of the evidentiary hearing conducted by Judge Cirigliano (e.g.,

the existence of signed verdict forms), he was placed, on appeal, in the same position as if he had

never even had an evidentiary hearing.  Of course, the Ohio Supreme Court would never have

disqualified the trial judge on the ground that there was a "significant likelihood that [she] will be

called to testify in subsequent proceedings about her actions in this case after she learned of

possible juror misconduct[ ]" (Doc. No. 35, Exh. 189) if, in fact, it believed that an evidentiary

hearing would be impermissible.  Therefore, this Court does find it odd that the Ohio court of

appeals refused to consider some of the testimony given at that evidentiary hearing on the ground

that it was "nearly seven months after the [mistrial] decision was made."  (Doc. No. 35, Exh.

31

(5:04 CV 0849)

312).  Although the hearing may have been conducted seven months later, the testimony at the hearing related to the events which occurred at the time of the mistrial decision.

Evidentiary rulings are generally not the subject of habeas review unless they implicate a constitutional right.  See Kelly v. Withrow, 25 F.3d 363, 370 (6th Cir. 1994).  In this case, the Court finds Petitioner's objection well-taken and therefore sustains the objection insofar as this Court rules that the Ohio court's refusal to consider some of the evidentiary material before it actually affected Petitioner's ability to make his double jeopardy argument before that court and had the effect of denying him a hearing.

### d.  Forcing a choice between constitutional rights

> *Ground A.vi* :  The Ninth Appellate District acted contrary to
> clearly established federal law in holding that the trial court could
> force Petitioner to choose between his double jeopardy rights and
> his impartial jury rights, when permitting Petitioner to exercise
> both his double jeopardy and impartial jury rights would not have
> placed any cognizable hardship on the prosecution.

Petitioner objects to the Magistrate Judge's conclusion that the ruling of the state court of appeals was not contrary to the holding of United States v. Dinitz, 424 U.S. 600 (1976).  (R&R at 47-49; Pet. Obj. at 4-6).  Petitioner has argued that, when both the trial court and the court of appeals rejected his suggestion that he be allowed to reserve the option to move for a mistrial until after a verdict was rendered (a motion which would have been made if guilty verdicts were returned), he was forced to choose between his right to have his case decided by the jury that had already been seated and his right not to be put in jeopardy twice.  Before the Ohio courts and this Court, Petitioner asserts that Dinitz stands for the proposition that, when a defendant's case has been prejudiced, "[t]he important consideration, for purposes of the Double Jeopardy Clause, is

32

(5:04 CV 0849)

that the defendant retain primary control over the course to be followed in the event of such error." Dinitz, 424 U.S. at 609.

The R&R concluded that Dinitz was inapposite because it involved a retrial following a mistrial declared on defendant's motion. Although pointing out the "Hobson's choice" recognized by the Dinitz Court, the R&R concludes that Dinitz "did not hold that a defendant could request that the jury continue to a verdict in the manner requested by Ross, that is, reserving the option for a mistrial dependent on the outcome of the jury deliberations." (R&R at 49).

This Court agrees with the Magistrate Judge's reading of Dinitz and with the Ohio court's conclusion, based on Dinitz, that "allowing the jury to determine a defendant's fate means that the defendant agrees to take his chances and is willing to accept the jury's verdict, be it guilty or not guilty." State v. Ross, 2002 WL 31890088, at *8.[18] Dinitz quite clearly identified the two choices faced by a defendant: (1) "giving up his first jury" or (2) "continuing a [tainted] trial[.]" Dinitz, 424 U.S. at 609. As properly pointed out by the Ohio court of appeals, Ross's suggestion of proceeding to a verdict and then, if the verdict was "guilty," allowing him to move for a mistrial, amounted to declining "a willingness to take his chances with the first jury, for he was only willing to accept a verdict of not guilty." Id. This is correct. Ross wanted not to make his Hobson's choice. The mere fact that it was a difficult choice does not mean, as Ross now argues,

_____

[18] A copy of original decision of the Ninth Judicial District Court of Appeals of Ohio can be found at Doc. No. 35, Exh. 241. Hereafter, any citations to this opinion will be to Doc. No. 35, Exh. 241.

33

(5:04 CV 0849)

that he could not "retain primary control over the course to be followed[.]"  <u>Dinitz</u>, 424 U.S. at

609.

Upon *de novo* review, the Court adopts the Magistrate Judge's conclusion that the Ohio

court of appeals did not act contrary to clearly established federal law with respect to this issue.

(R&R at 49).

### e.  Unreasonable determination of the facts

> ***Ground D.i*** : The conclusion of the Ninth Appellate District that
> the trial judge considered Petitioner's double jeopardy interest
> prior to declaring a mistrial was an unreasonable determination of
> the facts in light of the evidence presented at the state court
> proceeding within the meaning of § 2254(d)(2) and *Wiggins v.*
> *Smith*, 123 S.Ct. 2527 (2003).   AND

> ***Ground D.ii*** : The conclusion of the Ninth Appellate District that a
> juror at Petitioner's trial had refused to follow the court's
> instructions was an unreasonable determination of the facts in light
> of the evidence presented at the state court proceeding within the
> meaning of § 2254(d)(2) and *Wiggins v. Smith*, 123 S.Ct. 2527
> (2003).

Petitioner half-heartedly objects to the Magistrate Judge's conclusion with respect to

these two grounds that he has not met his burden of presenting clear and convincing evidence to

rebut the presumption of correctness with respect to state court findings of fact relating to these

grounds.  (R&R at 67-69; Pet. Obj. at 9-10).  Although Petitioner declares the fact of his

objection, he makes no further argument.  Accordingly, these "objections" are overruled.

Petitioner argues, in addition, that the Magistrate Judge erred in characterizing his

concern about the trial court's consideration of his double jeopardy interests as a concern over

the <u>sufficiency</u> of consideration.  Petitioner argues in his objection that he believes the trial court

34

(5:04 CV 0849)

gave <u>no</u> consideration to his right to take his case to the first jury.  He cites <u>United States v Jorn</u>,

400 U.S. 470 (1971).  He points to a single statement of the trial judge during the post-mistrial

evidentiary hearing which he believes suggests that she did not even know that he had a right to

take his case to his first jury.  As a result, he argues that it was unreasonable for the Ohio court of

appeals to make what he characterizes as a <u>factual</u> determination that a thorough inquiry had

been made into reasonable alternatives to declaring a mistrial.  (Pet. Obj. at 10).

This Court finds no merit in this objection, in view of the heavy burden that Petitioner

bears when attempting to challenge factual determinations of a state court in the habeas context.

Petitioner has not met that burden.  The objection is overruled.


## IV.  CONCLUSION

Having conducted a *de novo* review on the matters raised by the parties in their objections

to the Magistrate Judge's Report and Recommended Decision, the Court concludes that the

adjudication in the State courts "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States[.]"  28 U.S.C. § 2254(d)(1).

This Court is mindful of the gravity of this conclusion since it means that the State of

Ohio cannot re-try Petitioner on the very serious charges brought against him.  Nonetheless, if a

civil right such as that embodied in the Fifth Amendment prohibition against double jeopardy is

to have any meaning at all, this Court cannot simply look the other way when a State court

decision violates this prohibition.  As distasteful as it may be that serious charges escape

35

(5:04 CV 0849)

adjudication by the grant of this writ, bending the Constitution is not the solution.  Rather, the

solution lies in what the Supreme Court has identified as "a scrupulous exercise of judicial

discretion" prior to reaching a decision that "the ends of public justice would not be served by a

continuation of the proceedings."  United States v. Jorn, 400 U.S. 470, 486 (1971).

   For the reasons set forth above, the petition for writ of habeas corpus is GRANTED.

   IT IS SO ORDERED.


  August 22, 2005                                    s/ David D. Dowd, Jr.
Date                                                David D. Dowd, Jr.
                                                    U.S. District Judge

36